OPINION OF THE COURT
John Copertino, J.
This court has for its consideration after a hearing at which defendant neither testified nor called witnesses the legality of *772 defendant’s arrest, the voluntariness and admissibility of certain oral statements made by defendant to members of the Suffolk County Police Department, the legality of a search and resulting seizures made at defendant’s residence, and the admissibility of certain identification testimony.
The court’s findings of fact and conclusions of law follow.
During the early morning hours of June 21, 1983, Yvonne Hogan, the barmaid at the Crazy Clown Bar — a topless bar located at Wading River Road and Route 25 in Calverton— was brutally beaten to death. The body of Yvonne Hogan was found inside this bar lying on the floor near the front door. She had been severely beaten "about her upper torso.” "[A] great deal of blood * * * skin * * * hair, and flesh” was found throughout the bar. "It was a real bloody mess.” She was unclothed except for a T-shirt and a brassiere pushed up around her neck. Several chairs were toppled over; one had been broken. Upon examination, a "patent” palm print in the victim’s own blood was discovered on one of the legs of this chair. In addition, two of the chair’s legs were missing.
Robbery was discounted as a motive inasmuch as the victim’s money and the evening receipts were accounted for. A note from Yvonne Hogan to her employer describing the type of evening she had was found on the cash register which showed three beers as the last sale of the evening.
Karen B., a dancer at the Crazy Clown Bar — interviewed in late June or early July 1983 — had been in the bar for most of the time between the evening of June 20 and the early morning hours of June 21, 1983. One of the patrons she observed during the course of the evening — "off and on for a few hours” — was a white male in his early twenties, slight, dark hair which covered his ears, mustache, and dressed in an Army olive green T-shirt and jeans. Karen B. had a conversation with this patron during which he stated among other things that he "had just gotten out of the Army,” and had been in Germany. He also stated that he had drugs, lived "just up the road” and invited both Karen B. and Yvonne Hogan to "party” and "get high” with him and his brother after work. Both Karen B. and Yvonne Hogan said "no,” to this invitation.
Karen B. left the bar at approximately 3:05 a.m. on June 21, 1983. One of two people to leave immediately before her was the patron in the olive green T-shirt. She observed him walk out the door and down the road to the north of the bar.
*773 On June 28, 1983, a week after the homicide, a road block was set up at the intersection of Wading River Road and Route 25 by the police. As a result of this road block, Orlando P., a frequent patron of the Crazy Clown — who had been in the bar from approximately 2:30 a.m. until "a little after 3 o’clock” on June 21, 1983 — was stopped. He told authorities that upon entering the bar he noted 5 or 6 people in the premises, and after ordering a beer "looked around” to see if he knew anyone. To his right he noticed a young man in his early twenties with black hair extending "a little over his ears.”
A search of the area around the Crazy Clown Bar was conducted on June 30, 1983. The missing chair legs were discovered approximately two tenths of a mile east of the bar and on the south side of Route 25.
The investigation continued with hundreds of palm prints being compared to the "patent” palm print found on the broken chair. Several hundred people were "checked out.” It goes without saying that the police also tried to locate the patron in the olive green T-shirt. No leads to the identity of the killer or killers developed until April 1985.
On April 7, 1985, Debbie O., who had initially been questioned in 1983, contacted the Riverhead Town Police and informed them that one Mark B. knew who had committed the murder at the Crazy Clown Bar, telling them that she had had a conversation with Mark B. on April 3, 1985, during which he told her that Thomas Greene committed the murder. Debbie O. was also Greene’s neighbor, and informed the police that the Greene family had moved to upstate New York but that Thomas Greene and Richard Greene "were living at the house in Calverton Court.” In addition, she stated that Thomas Greene "had been in the service.” It was soon realized that Calverton Court is within walking distance and to the northeast of the Crazy Clown Bar.
On April 8, 1985, and after meeting with Mark B., the Riverhead Town Police contacted the Suffolk County Police and informed them of Mark B. They arranged for an interview between Mark B. and Suffolk County Police to take place the next day. Also, on April 8, 1985, Detective Me C. was instructed to ascertain "if an individual by the name of Thomas Greene had been committed to any hospital on June 21, 1983.” Me C. learned that Thomas Greene had been committed to Kings Park State Hospital at approximately 2:00 p.m. on June 21, 1983.
*774 At 11:00 a.m. on April 9, 1985, Detective Me C. of the Suffolk County Police Department along with Detective Sergeant V. and Detective S., both of the Riverhead Town Police Department, met with Mark B. Mark B. stated that in the summer of 1983, Richard Greene, Thomas Greene’s brother, informed Mark B. that Thomas Greene committed the murder at the Crazy Clown Bar. After swearing Mark B. to silence, Richard Greene told Mark B. what had transpired on the night in question.
Richard Greene related to Mark B. that both Richard Greene and Thomas Greene along with Steve S. were in the bar that evening. Near closing time, Steve S. left the bar. When Thomas Greene asked the barmaid for another beer, she refused. This upset Thomas, and he pulled her over the bar. At this point, Richard left and went home. Several hours later Richard heard some noise outside their home and found Thomas covered with "blood, skin, meat, and hair.” It was at this point that Mark B. said to Richard "Boy, that is really gross.” Richard retorted, "Well, what did you expect? He beat her to death.” Richard then helped Thomas into the house, removed Thomas’s clothes, threw them into a closet, and put Thomas into the shower. Later that morning Thomas "flipped out,” and was taken by his family to the hospital where he was admitted. Several days later Richard removed the clothes from the closet and placed them in the cesspool. Mark B. then repeated this information to the detectives in a sworn written statement.
At 4:25 p.m. on April 9, 1985, Detectives Me C. and L. were observing 28 Calverton Court, Thomas Greene’s residence, at which time they observed defendant exit the premises. They approached defendant and inquired if he was "Tommy Greene.” Detectives Me C. and L. identified themselves and placed defendant under arrest. When defendant asked "What for?” he was informed "For the murder of the girl at the Crazy Clown Bar.” Defendant blurted "I didn’t do it!” to which Detective Me C. replied "Wait a minute before you say anything” and proceeded to advise defendant of the required fourfold Miranda warnings. When asked if he understood his rights, defendant replied "Yes.” When asked if he wanted to contact a lawyer, defendant stated, "No. I didn’t do anything.” When asked if he would talk to the detectives without a lawyer being present, defendant again replied "Yes.” As Detective Me C. commenced to handcuff defendant, defendant on request was permitted to "close-up” the house. After securing *775 the house defendant was then handcuffed for the 20-minute ride to Suffolk County Police Headquarters in Yaphank.
During the ride to headquarters Detective Me C. told defendant that they were in possession of "conclusive evidence” that defendant was guilty of the murder, that a palm print had been found, and that "he should get this whole thing off his chest and tell us what happened.” Defendant denied any involvement.
After arriving at police headquarters at approximately 4:50 p.m., defendant was taken to Sergeant J. who interviewed defendant at approximately 5:15 p.m. "with regard to the prisoner activity log.” Then, Officer G. finger- and palmprinted defendant after which defendant was interviewed until approximately 6:00 p.m., during which time he continued to deny any involvement in the homicide.
At approximately 7:10 p.m., Officer G. informed Detective Me C. that defendant’s left palm print and the "patent” palm print on file matched. Detectives Me C. and L. returned to the interview room — where they had left defendant — and confronted him with the fact that the palm prints matched and told him that he committed the murder. Defendant continued to deny his involvement until Detective Me C. asked, "Are you worried about your brother?” to which defendant retorted, "What do you mean my brother?” At this point Detective Me C. stated, "We know exactly what happened with your brother, with the clothes, with the cesspool.” Defendant then began to cry and stated, "I did it. I beat her to death.”
Detectives Me C and L. continued "pressing” defendant to tell them about the incident and why he did it. Defendant replied, "I can’t talk about it.” Inasmuch as defendant was saying he could not — as opposed to would not or did not want to — "talk about it”, Detective Me C. asked defendant if he would answer questions which could be answered with either a "yes” or a "no.” At Detective Me C.’s suggestion defendant agreed to questions which required a simple "yes” or "no” answer. Answering questions in this form, defendant admitted that he forced Yvonne Hogan to take her clothes off, "tried to have intercourse with her” that she refused, and that because of such refusal beat her with a chair. When shown a picture of the broken chair and asked if it was the chair he used, defendant replied, "It looks like it.” When asked where the rest of the chair was, defendant did not reply, and when asked if he threw it away, replied "yes.”
*776 Detectives Me C. and L. then attempted to discuss Richard Greene’s involvement in placing defendant’s clothes in the closet and cesspool. Defendant again replied "I can’t.” On inquiry, defendant agreed to provide the officers with a consent to search form. Two forms were prepared which defendant read and signed.
At approximately 9:15 p.m. and after defendant executed the consents, Detective Me C. requested defendant to provide them with a short written statement "as to what he had told them.” Defendant said "No,” and Detectives Me C. and L. thereupon left the room.
At approximately 10:30 p.m. defendant upon being asked if he wanted anything to eat replied, "No.”
Later that night defendant was transported to the Sixth Precinct for overnight lodging and was informed he would be arraigned at the Riverhead Justice Court in the morning.
At approximately 8:00 a.m. on April 10, 1985, Detectives Me C. and L. transported defendant to the Riverhead Police Department to await arraignment. Between 9:45 and 10:00 a.m. defendant made three telephone calls. At approximately 10:30 a.m. defendant declined to provide hair, blood and saliva samples, and for the first time requested a lawyer.
At the arraignment, Detective Me C. presented the court with an application for a warrant to search defendant’s residence at 28 Calverton Court. After Detective Me C. swore to the truth of the information contained in the application before Judge L., the latter issued the search warrant, which was "turned over” to Detective Leon Me K. to execute. The search of 28 Calverton Court revealed a small green rug which was taken from a hall closet and a cloth remnant which was retrieved from the cesspool.
On April 17, 1985, Detectives Me C. and Me K. went to the home of Karen B. in order to have her view a "photospread.” After determining that Karen B. had not seen a photograph of defendant which had recently appeared in a local newspaper, Karen B. viewed five photographs which were spread in front of her. After viewing the faces in the photographs, she selected photograph No. 3 — that of defendant — as the person she had spoken to in the Crazy Clown Bar and who was wearing the olive green T-shirt.
Detectives Me C. and Me K. then went to the home of Orlando P. so that he too could view the "photospread.” Again, after ascertaining that Orlando P. had not seen this *777 photograph of defendant which had appeared in the local paper, Orlando P. was permitted to view the five photographs which comprised the "photospread.” After viewing the faces in the photographs for "two or three minutes,” Orlando P. selected photographs Nos. 3 and 5 because "they looked like almost the same person * * * that I had seen that night at the bar.” Photograph No. 3 was that of defendant.
Four issues are presented to this court for determination: (1) was there probable cause to arrest defendant; (2) were defendant’s oral statements voluntary; (3) were the search of defendant’s premises and resulting seizures valid;[1] and (4) were the "photospread” identifications suggested or suggestive. The first three issues are resolved in the affirmative, the last in the negative, and defendant’s motion is denied.
In New York, so far as the first issue is concerned, a police officer may arrest a person without a warrant for a crime when the officer has reasonable cause to believe that such person has committed such crime, whether in the officer’s presence or otherwise (CPL 140.10 [1] [b]). CPL 70.10 (2) provides in relevant part: " 'Reasonable cause to believe that a person has committed an offense’ exists when evidence or information which appears reliable discloses facts or circumstances which are collectively of such weight and persuasiveness as to convince a person of ordinary intelligence, judgment and experience that it is reasonably likely that such offense was committed and that such person committed it.”
The "reasonable cause” necessary for an arrest and the "probable cause” necessary for a search warrant are the same (People v Johnson, 66 NY2d 398, 402, n 2; People v Lombardi, 18 AD2d 177, affd 13 NY2d 1014; Veras v Truth Verification Corp., 87 AD2d 381; see, Draper v United States, 358 US 307 [probable cause and reasonable grounds are substantial equivalents])., Further, "cause may be supplied, in whole or part, through hearsay information” (People v Johnson, supra, at 402).
The information acted upon here, however, was not merely that given by an informant to a police officer, but that given by still another person to the informant, "hearsay-upon-hearsay.” As is stated in 1 LaFave, Search and Seizure (§ 3.2 [d], at 469-470 [1978]), "Even hearsay-upon-hearsay may be utilized to show probable cause.83 This is not to suggest, of course, that *778 any type of hearsay will inevitably amount to probable cause. There must be 'a substantial basis for crediting the hearsay’ ”.[2] (See also, People v Restrepo, 87 AD2d 320; People v Simon, 118 Misc 2d 745.)
In determining whether there is "a substantial basis for crediting the hearsay”, United States v Spach (518 F2d 866, 869) requires that "both prongs of the Aguilar test [be] met at each level.” At Richard Greene’s level, the first prong of the Aguilar test (reliability) is satisfied in that his statement to the effect that he cleaned his brother and disposed of his clothes was a statement against his penal interest (People v Comforto, 62 NY2d 725; United States v Harris, 403 US 573); in that, by swearing Mark B. to silence "he believed that he was making [the statement] to someone who would not disclose them to the authorities” (People v Restrepo, supra, at 324); in that his statement to the effect that defendant had been admitted to a hospital was verified by the police prior to his arrest (People v Santiago, 13 NY2d 326; People v Coffey, 12 NY2d 443, cert denied 376 US 916; People v Malinsky, 15 NY2d 86; People v Marshall, 13 NY2d 28; People v Alaimo, 34 NY2d 187); and above all, in that by relating what he did— without any motive to fabricate being apparent — accused his own brother of committing a vicious, grotesque, and horrible crime. The second prong of the Aguilar test (basis of knowledge) is satisfied in that Richard Greene observed whatever he related to Mark B. — from which it can be inferred that defendant was responsible for the homicide at the Crazy Clown.
At Mark B.’s level, the first prong is satisfied in that Mark B. was not an anonymous informant (People v Hicks, 38 NY2d 90), and that he provided this information to the police in a sworn statement (People v Wheatman, 29 NY2d 337). The second prong is satisfied in that Mark B. received this information from Richard Greene and that Richard Greene’s statement — as previously discussed — was reliable. In effect, Mark B. was a reliable and credible conduit for information which had a satisfactory basis of knowledge.
Accordingly, this court finds that the People have met their "burden of coming forward with evidence establishing probable cause” for the arrest (People v Dodt, 61 NY2d 408; People *779 v Bouton, 50 NY2d 130; People v Berrios, 28 NY2d 361; People v Malinsky, 15 NY2d 86, supra).
This court further concludes as a matter of law that defendant was unequivocally accorded his constitutional rights under Miranda v Arizona (384 US 436), that he knowingly, intelligently and voluntarily waived these rights and agreed to speak to Detectives Me C. and L., and that the oral statements attributed to defendant were voluntary beyond a reasonable doubt.
Finally, this court concludes as a matter of law that the pretrial "photospread” identification of defendant by the witnesses was not suggestive and not violative of defendant’s right to due process of law. Defendant has failed to meet his burden of showing impropriety on the part of the police after the People had "properly met their * * * burden of going forward with evidence by showing the [propriety] of the police conduct” (People v Sutton, 47 AD2d 455, 459). Despite the fact that the five photographs used in the "photospread” had different "finishes” and that the date each was taken was shown thereon, the court attaches no importance to this inasmuch as both witnesses testified that they were not influenced by any factor other than the face of the person in the photograph.
Accordingly, defendant’s motion is denied.

. The determination of this issue is moot because the People did not offer the seized items as evidence on the trial of this action.

. Footnote 83 cited in the quote from 1 LaFave, Search and Seizure (§ 3.2 [d], at 468-469) cites United States v Spach (518 F2d 866 [7th Cir 1975]) in addition to other cases.