THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
THOMAS S. GREENE, Appellant.

Second Department, February 13, 1990

 

## APPEARANCES OF COUNSEL

*John F. Middlemiss, Jr. (Monroe A. Semble* of counsel), for appellant.

*James M. Catterson, Jr., District Attorney (Steven A. Hovani* of counsel), for respondent.

## OPINION OF THE COURT

Lawrence, J.

The defendant's conviction arose from charges based on the

attempted rape and murder of a barmaid at the Crazy Clown Bar in Calverton. We have examined the defendant's claims that numerous errors deprived him of a fair trial. While reversal of the judgment is not required, the challenges to the admission of certain evidence at the trial warrant discussion.

## I.

The defendant claims that the People did not prove that the police had probable cause to arrest him. Consequently, he contends that his oral statements to law enforcement officials concerning his commission of the murder, his signature on various photographs shown to him during his interrogation by the police, and the People's expert testimony that his palm-print matched a palmprint found on the leg of a broken chair found at the Crazy Clown Bar should not have been admitted at the trial since this evidence was the fruit of his illegal arrest.

At the hearing held on the defendant's suppression application, the testimony presented by the People established that on June 21, 1983, in the morning hours, the victim had been found brutally beaten to death inside the bar. Specifically, she had been "beaten severely about her upper torso * * * the bones in her hands were all broken * * * [h]er forearms were fractured". The body was "covered with blood from head to foot" and missing pieces of scalp and hair. In addition, several chairs had been knocked over and one chair had been broken with the legs detached, and two chair legs were missing. The missing chair legs were purportedly discovered "[a]pproximately two-tenths of a mile east of the Crazy Clown [Bar] off of Route 25 on the south side of the roadway".

Shortly after the incident, the police located two witnesses who were present at the bar on the night of the incident. A dancer at the bar recalled seeing and talking to a young man, later identified by her as the defendant, who had stated, in pertinent part, that he had just gotten out of the army, he lived "just up the road" and he had a brother. The dancer further stated that when she left the bar at about 3:05 A.M., there were three college-aged men in the bar but the defendant had left the bar just before she did and she saw him walking down the road, heading north. (At the hearing, the photographs admitted into evidence showed that the defendant lived to the east and slightly north of the Crazy Clown Bar.) A bar patron also stated that he had seen a young man,

as well as 5 or 6 other people, in the bar that evening from about 2:30 A.M. until about 3:15 A.M., when he left. The bar patron did not see the young man leave the bar before he did. At the hearing, the bar patron was "80% sure" that the young man he had seen was the defendant.

No further leads to the identity of the murderer developed until April of 1985. At that time, a young woman contacted the police and told them that she had information implicating the defendant in the murder. Specifically, she stated that she was a neighbor of the Greenes, and that the defendant had been in the service. She further recounted a conversation with Mark B., who had told her that the defendant's brother, Richard, had confided in him that the defendant had murdered the barmaid and had subsequently "flipped out" the afternoon following the murder. The police confirmed that the defendant had been admitted to Kings Park State Hospital on the afternoon of June 21, 1983.

At a subsequent meeting with the police, Mark B. told them that during the summer of 1983, he and his friend, Richard Greene, had been sitting in a car. While they were drinking vodka, they heard passersby talking about the Crazy Clown Bar murder. Richard then commented that he knew who had murdered the barmaid and, after Mark B. mentioned the defendant's name, Richard acknowledged that the murderer was his brother, the defendant. Richard then described what had occurred at the bar, stating that he had gone to the bar with the defendant and their cousin; after the cousin had left, the brothers remained until around closing time; the defendant became enraged after the barmaid refused to serve him; and when the defendant dragged the barmaid over and across the bar, Richard decided to leave the bar. In the early morning hours of the next day, Richard found the defendant in the front of their house. The defendant was "covered with blood, skin, meat and hair". When Mark B. commented on the description of the defendant's appearance, Richard replied, "Well, what did you expect? He beat her to death". Richard then stated that he proceeded to remove the defendant's clothes, secreted them in a hall closet and some time later he disposed of them in a cesspool. Richard further indicated that the defendant "flipped out" later that day and was admitted to a hospital. At the conclusion of the meeting, Mark B. provided the police with a sworn written statement memorializing his oral statement. According to the police, Mark B. further indicated that Richard had sworn him to secrecy.

Without doing any further investigation, the police arrested the defendant.

The hearing court held that the evidence was sufficient to support a finding that there was probable cause to arrest the defendant, specifically noting that Mark B.'s statement was sufficient to meet the People's " 'burden of coming forward with evidence establishing probable cause' for the [defendant's] arrest" *(People v Greene,* 137 Misc 2d 771, 778).

The validity of the warrantless arrest in this case rests upon whether, at the time of the arrest, the officers' knowledge of the facts and circumstances was sufficient to establish reasonable cause to believe that the defendant had committed the murder *(see,* CPL 70.10 [2]; 140.10 [1] [b]; *People v Johnson,* 66 NY2d 398, 402, n 2; *see also, McCray v Illinois,* 386 US 300, *reh denied* 386 US 1042). However, as noted by the hearing court, while the reasonable cause necessary for a warrantless arrest "may be supplied, in whole or part, through hearsay information" *(People v Johnson, supra,* at 402; *see,* CPL 710.60 [4]), in this case, part of the information relied on by the police, Mark B.'s statement, "was not merely that given by an informant to a police officer, but that given by still another person to the informant, 'hearsay-upon hearsay' " *(People v Greene, supra,* at 777).[1]

■ Before there can be reliance based on hearsay, "it must appear, in the language of the *Aguilar-Spinelli* rules, that the informant has some basis of knowledge for the information he [has] transmitted to the police and that the information is reliable" *(People v Johnson, supra,* at 402). In this case, the reliability prong of the *Aguilar-Spinelli* rules was satisfied by the fact that Mark B., an identified citizen, gave a sworn statement to the police *(see, People v Johnson, supra,* at 403; *People v Hicks,* 38 NY2d 90; *see also, People v Wheatman,* 29 NY2d 337, 345-346). At issue in this case is the basis of knowledge prong of the *Aguilar-Spinelli* rules. Initially, we note that there is no requirement that the information fur-

---

1. We are cognizant of our prior decisions wherein we have noted that the suppression hearing testimony of a police officer concerning the statements made by an informant "is not truly hearsay" since it is not offered as evidence of its truth but only of the fact that it was made *(People v Sanders,* 79 AD2d 688, 689-690; *see, People v Inman,* 80 AD2d 622). Nevertheless, a determination must be made as to "whether the nature of the accusation, and the circumstantial indications of its reliability, were sufficient to justify the ensuing police conduct. *(Cf. People v Elwell,* 50 NY2d 231; *People v West,* 44 NY2d 656.)" *(People v Sanders, supra,* at 689-690.)

nished by Mark B. had to be the product of his personal observations of criminal activity *(see, United States v Button, 653 F2d 319, 324, n 6; United States v Spach, 518 F2d 866; United States v Romano, 482 F2d 1183, cert denied sub nom. Yassen v United States, 414 US 1129; United States v McCoy, 478 F2d 176, cert denied 414 US 828; United States v Fiorella, 468 F2d 688, cert denied 417 US 917, reh denied 419 US 885; United States v Smith, 462 F2d 456; Waldrop v State, 424 So 2d 1345 [Ala]; State v Alger, 100 Idaho 675, 603 P2d 1009; Dawson v State, 11 Md App 694, 701, n 3, 276 A2d 680, 683, n 3; People v Watson, 100 AD2d 452, 462, n 6; People v Restrepo, 87 AD2d 320; People v Simon, 118 Misc 2d 745, 107 AD2d 196; Commonwealth v Kaschik, 235 Pa Super 388, 344 A2d 519).* "What is required is information of such quality, considering its source and the circumstances in which it came into possession of the informant, that a reasonable observer would be warranted in determining that the basis of the informant's knowledge was such that it led logically to the conclusion that a crime had been * * * committed" by the defendant *(People v Restrepo, supra, at 323-324; see, United States v Smith, supra).* As noted by the Court of Appeals, "the basis of knowledge test is * * * intended to weed out, as not of sufficient quality, data received by the informant from others who have not themselves observed facts suggestive of criminal activity" *(People v Elwell, 50 NY2d 231, 237).* In this case, as found by the hearing court, Richard Greene's statements were based on his personal observations and conversation with the defendant, thereby satisfying the basis of knowledge prong of the *Aguilar-Spinelli* rules. Further, the reliability prong of the *Aguilar-Spinelli* rules was also satisfied with respect to Richard Greene's statements. Specifically, his statements concerning his disposal of his brother's clothing were declarations against his own penal interest *(see, United States v Harris, 403 US 573; People v Johnson, supra, at 403-404; People v Comforto, 62 NY2d 725).* Contrary to the defendant's specific contention, Richard's statements would support a charge of hindering prosecution in the first degree *(see, Penal Law § 205.65; see also, People v Bulger, 52 AD2d 682);* and there was no showing that he was not aware that such conduct on his part constituted a criminal offense *(see, People v Simon, 118 Misc 2d, at 748, supra).* Further, the circumstances under which Richard Greene made his statements, in confidence to Mark B., and their nature do not indicate that the statements were fabricated or constituted "a perverted bragging with no relation to

reality". In fact, the statements were, in part, corroborated by prior police investigation, including the time and the manner in which the barmaid was murdered and the defendant's hospitalization on the afternoon following the murder.

Therefore, we agree with the hearing court that "Mark B. was a reliable and credible conduit for information which had a satisfactory basis of knowledge" *(People v Greene, supra,* at 778). Since the police had reasonable cause to arrest the defendant, the preclusion of any evidence based on the arrest was not warranted.

## II.

In addition to the admission, in pertinent part, of the defendant's inculpatory oral statements, the prosecutor introduced expert testimony concerning a partial palmprint found on one of the detached chair legs found inside the Crazy Clown Bar. Specifically, a police officer and his partner, a civilian working in the police department, testified that the found palmprint matched the left palmprint of the defendant. During the testimony of the police officer, he was asked who had looked at the impressions of the found palmprint and the defendant's palmprint, to which the witness named an individual. When asked what the vocation of the individual was, the witness replied, "fingerprint expert for [the defense counsel]". This reply drew an objection by defense counsel. At a sidebar conference, outside the presence of the jury, defense counsel moved for a mistrial based upon the fact that the witness's response required the defendant to call his retained expert, because if he failed to do so, it was clear that the jury would infer that the only reason for not calling him was that his testimony would corroborate the testimony of the prosecutor's witness. The mistrial application was opposed by the prosecutor on the ground that the answer was only partially responsive to the question. After noting that the witness had not revealed the conclusion reached by the defense counsel's expert, which might, in any event, corroborate the witness's testimony, the court denied the mistrial application. The defense counsel did not thereafter request any redaction or curative instructions with respect to the answer concerning the vocation of the named individual who viewed the palmprints.

After presenting the testimony of his two experts, the prosecutor indicated that he intended to call as a witness the

expert originally retained by the defense counsel to inspect the palmprints. The defense counsel objected to the witness's proposed testimony on the following grounds: (1) it would violate the defendant's attorney-client privilege because the expert was an agent of the defense counsel, (2) it might require defense counsel to take the stand to impeach the witness's testimony, and (3) it was not indispensable evidence but merely cumulative. The prosecutor responded to the defense counsel's objection, stating that (1) the witness had apparently indicated, at the time he viewed the palmprints in the presence of two detectives from the District Attorney's office, that the found palmprint matched the defendant's palmprint and there was no need for him to make a report,[2] (2) such cumulative testimony was very material and relevant in light of the defense counsel's cross-examination of the police officer who had already testified on behalf of the People,[3] and (3) it was not foreseeable that defense counsel would have to testify. The court deferred its ruling on the issue until the People actually called the witness.

Thereafter, prior to the actual testimony of the defense-retained expert, defense counsel renewed his objection to the testimony on the grounds that it was an invasion of the defendant's right to counsel, the confidentiality of attorney and client, and defense counsel's work product. The People opposed the defendant's position on the grounds that the witness (1) did not "belong" to either party, and (2) would not be asked any questions concerning any conversations that he had had with defense counsel or the defendant. When defense counsel expressed concern, in relevant part, that as soon as it was brought out that the witness was originally retained by the defendant and he was not being called by defense counsel, that defense counsel's credibility would be in question since he

---

2. The defense counsel disagreed with the prosecutor's "interpretation" as to what was said by his expert at the time he viewed the palmprints in the District Attorney's office but defense counsel, who was present at that time, did not clarify what the expert had said. During the expert's testimony, he denied that he had told anyone in the police department or the District Attorney's office what his findings were prior to the time the prosecutor had called him and asked him to testify a few days before his testimony.

3. The cross-examination of the police officer consisted, in pertinent part, of extensive questioning concerning the fact that the witness had not made a report or taken notes detailing his finding that there were 22 characteristics which confirmed that the defendant's palmprint matched the found palmprint.

was not telling the jury everything, the trial court directed that the witness should first be examined and cross-examined outside the jury's presence to evaluate the defense counsel's concern. After this hearing, defense counsel indicated that he still objected to the witness's proposed testimony on the ground of "[t]he inherent difficulty of [a defense] witness being called by the prosecution". After defense counsel indicated that there was no likelihood that he would have to take the stand to dispute the witness's testimony, the trial court indicated it would permit the witness to testify in the presence of the jury. At no time did the defense counsel specifically request that the prosecutor be precluded from indicating that the witness was originally retained by defense counsel.

During the witness's testimony, he was qualified as an expert, and he testified to his comparison of the found palmprint and the defendant's palmprint on two separate occasions and his conclusions that the palmprints matched. As to the second occasion, he indicated that he did the comparison at the request of defense counsel. During cross-examination, in pertinent part, defense counsel delved into his retention of the witness and his dissatisfaction with the reports of this witness, concurred in by the witness, because they did not contain any details.

■ The defendant's claim that the admission of his retained expert's testimony violated his right to effective assistance of counsel because it interfered with his attorney-client privilege is based on a Federal case *(United States v Alvarez,* 519 F2d 1036 [involving the prosecutor's use of a psychiatrist who was retained by defense counsel to aid in trial preparation of an insanity defense]), and two out-of-State cases *(State v Mingo,* 77 NJ 576, 392 A2d 590; *Hutchinson v People,* 742 P2d 875 [Colo] [both cases involving the prosecutor's use of a handwriting expert who was retained by defense counsel]). In these cases, the courts held that the testimony of defense-retained experts should have been excluded because an "attorney must be free to make an informed judgment with respect to the best course for the defense without the inhibition of creating a potential government witness" *(United States v Alvarez, supra,* at 1047; see, *State v Mingo, supra,* at 593; *Hutchinson v People, supra,* at 881-882); and that a contrary rule might deter defense counsel "from hiring experts lest they inadvertently create or substantially contribute to the prosecution's case against their clients. Or, if an expert were hired, an attorney might have to insist on limited communications to

assure his client protection if the expert were called as a state witness. As a protection, defense counsel might also tend to hire those experts whose opinions are more predictable— rather than independent experts—whose advice might be more helpful, but more risky to obtain" *(Hutchinson v People, supra,* at 882). We do not find the reasoning of these cases to be persuasive on this issue. Instead, we find that "[a] witness is not the property of either party to a suit and simply because one party may have conferred with a witness and even paid him for his expert advice does not render him incompetent to testify for the other party" *(People v Speck,* 41 Ill 2d 177, 200, 242 NE2d 208, 221, *revd on other grounds* 403 US 946, *reh denied* 404 US 875 [involving the prosecutor's use of a fingerprint expert who was retained by defense counsel]; *see, United States v Pipkins,* 528 F2d 559, *cert denied* 426 US 952 [involving the prosecutor's use of a handwriting expert who was retained by defense counsel]; *Perez v People,* 745 P2d 650, 654-655 [Colo] [dissenting opn] [involving the prosecutor's use of a psychiatrist who was retained by defense counsel]; *People v Edney,* 39 NY2d 620, 624-625 [involving the prosecutor's use of a psychiatrist who was retained by defense counsel]). In *People v Edney (supra,* at 624-626), the court held, in relevant part, that the admission of the testimony of the defense-retained psychiatrist did not violate the defendant's attorney-client privilege or the related doctrine concerning the attorney's work product. In making this determination, the court specifically rejected the decision rendered in *United States v Alvarez (supra),* and noted that the policy behind the defendant's attorney-client privilege would not be harmed by the admission of evidence which, in any event, in the circumstances therein, would be available to the prosecution. While *People v Edney (supra)* involved the use of the defense-retained expert as a rebuttal witness and the offered testimony only involved the issue of the defendant's sanity and not his guilt, contrary to the defendant's contention, the court's rationale was not based on these distinctions *(see, Perez v People, supra,* at 654-655 [dissenting opn]). We find, therefore, that the court's determination in *People v Edney (supra),* is applicable to the testimony of the defense-retained expert in this case. Specifically, what is involved herein is merely the expert's opinion concerning nontestimonial evidence, which was properly acquired by the prosecution; and not any confidential communications between the defendant or his counsel and the retained expert. The expert's testimony about the palmprints

was not " 'inextricably intertwined with communications which passed between him and his client,' and we do not confront testimony that necessarily 'comprehended conclusions drawn in the course of an association that is uniquely regarded in the law.' *(United States v. Kendrick, supra,* 331 F.2d [110], 115 (concurring opinion)." *(United States v Pipkins, supra,* at 564.) Moreover, the opinion testimony of the expert regarding the palmprint evidence did not violate the defendant's privilege against self-incrimination *(see, Gilbert v State of California,* 388 US 263; *Schmerber v California,* 384 US 757; *cf., Hutchinson v People, supra,* at 882).

Accordingly, under the circumstances herein, the trial court did not err in permitting the prosecutor to call the defense-retained expert on the People's direct case.

■ As to the defendant's additional claims that the jury was unduly prejudiced by the introduction into evidence, and the prosecutor's summation remarks, regarding the fact that the expert had been originally retained by the defense counsel, we initially note that these specific issues were not preserved for our review as a matter of law *(see,* CPL 470.05 [2]; *People v Medina,* 53 NY2d 951). In any event, we find that under the circumstances herein, the admission of the information that the expert was initially retained by defense counsel cannot be said to have unduly prejudiced the defendant's case in light of the other opinion testimony concerning the palmprint evidence *(see, State v Mingo, supra,* at 596; *cf., Hutchinson v People, supra,* at 886-887). Further, the prosecutor's summation remarks were clearly an appropriate response to defense counsel's summation remarks *(see, People v Marks,* 6 NY2d 67, *cert denied* 362 US 912; *People v Colon,* 122 AD2d 151, 152).

### III.

The People were further permitted to introduce at trial, over the defendant's objection, expert testimony that with respect to the legs of the broken chair, which were found outside the bar, one leg was definitely once part of the broken chair found inside the Crazy Clown Bar, and the other leg "corresponded physically" but not in sufficient degree to allow a conclusive match.

The defendant contends that because wood fracture analysis was not within the expert's area of expertise, his testimony should have been excluded by the trial court. However, it is well settled that "a witness's qualification to testify as an

expert rests in the discretion of the trial court, and its determination will not be disturbed in the absence of serious mistake, an error of law or abuse of discretion" *(Werner v Sun Oil Co.,* 65 NY2d 839, 840; *see, Meiselman v Crown Hgts. Hosp.,* 285 NY 389, 398-399). In order to qualify as an expert, "a showing [must be] made that the witness was skilled in the profession to which the subject relates" *(Meiselman v Crown Hgts. Hosp., supra,* at 398). However, the "skill [may be acquired] either from study, experience or observation. No precise rule has been formulated and applied as to the exact manner in which such skill and experience must be acquired. Long observation and actual experience, though without actual study of the subject, qualify a witness as an expert in that subject" *(Meiselman v Crown Hgts. Hosp., supra,* at 398; emphasis supplied). Likewise, a witness, for example, a physician, may qualify himself or herself from the "study of the subject alone" *(Meiselman v Crown Hgts. Hosp., supra,* at 398).

In this case, the People's witness testified, in pertinent part, that he had some training comparing two items of wood to determine if they were once joined together as one item, which consisted of physically matching or jigsaw matching two items to establish through the fracture pattern whether one piece was once part of the other piece. Specifically, he had taken two pieces of wood and physically matched them together as a jigsaw-type puzzle to see whether one piece of wood broke from the other. As to his work in wood, he had done it under "laboratory circumstances, experimental as well as case work". Further, while his training in undergraduate college and graduate school and at the Federal Bureau of Investigation forensic training center in Virginia for two weeks, concerning fracture pattern analysis did not deal specifically with wood, the witness indicated that the comparison of fracture patterns is the same regardless of the substance. The witness indicated that he had testified 12 prior times as an expert in the field of fracture patterns and jigsaw materials.

■ Under the circumstances, we find that the trial court did not err or abuse its discretion by permitting the People's witness to testify as an expert concerning the wood fractures in the broken chair. His testimony was not beyond the sphere of his expertise, which included on-the-job experience with wood fracture patterns. The extent of his qualifications was a "subject for the jury on the question of the weight to be given to his testimony" *(Meiselman v Crown Hgts. Hosp., supra,* at

398; *see, De Luca v Kameros,* 130 AD2d 705, 706; *People v De Sarno,* 121 AD2d 651, 654). Contrary to the defendant's further contention, there was nothing in the witness's testimony that could be deemed incredible as a matter of law. Moreover, any error with respect to the admission of this expert testimony was clearly harmless. The defendant's only connection with the chair legs found outside the bar was that his house was located a little further east from where the chair legs were found. However, the alleged fingerprint impression found on one of these legs could not be conclusively identified as having been made by the defendant[4] and there was no indication in the record on which leg the fingerprint impression was found.

## IV.

Accordingly, the judgment of conviction is affirmed.

BROWN, J. P., EIBER and SULLIVAN, JJ., concur.

Ordered that the judgment is affirmed.

---

4. Contrary to the respondent's contention on appeal, the expert originally retained by defense counsel did not testify that he had either viewed or concluded that the alleged fingerprint matched the defendant's fingerprint. On cross-examination and redirect, he clarified his direct testimony, and specifically stated that he had not viewed any found fingerprints but only the palmprint on the chair leg found inside the Crazy Clown Bar.