■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JANE CAMPBELL, Appellant. [626 NYS2d 462] —Judgment, Supreme Court, New York County (Frederic Berman, J.), rendered May 28, 1992, convicting defendant, upon her plea of guilty, of criminal possession of a controlled substance in the fifth degree, and sentencing her, as a second felony offender, to a term of one and a half to three years in prison, affirmed.

The police were entitled to rely on the word of an employee of the Department of Housing Preservation and Development who came to the precinct to report that trespassers were present in an apartment in a building owned by the Department and to request police assistance in removing them. Specifically, we find that the status of the informant as a management level employee of the Department was clearly sufficient to support his reliability. We note that there is no evidence on the record indicating that the informant had previously supplied incorrect information to the police.

Moreover, it is clear that an informant's basis of knowledge may be inferred from the circumstances *(see, e.g., People v Rodriguez*, 52 NY2d 483, 492-493) and may itself be based on hearsay, if that hearsay is from a reliable source *(People v Parris*, 83 NY2d 342, 347-348; *People v Greene*, 153 AD2d 439, 444, *lv denied* 76 NY2d 735, *cert denied* 498 US 947). In this case, we find that the employment status of the informant provided sufficient support for the inference that his knowledge that an apartment was legally vacant was based on personal familiarity with the legal status of the apartments owned by his employer or on information gleaned from an equally reliable source, i.e., either another employee with such familiarity or Department records. Indeed, had anyone else come to the precinct with a similar complaint, the best way

for the police to verify the status of the apartment would have been to check with a Department employee such as this informant. The fact that the testifying officer recalled the informant's status as a "manager," while the informant himself identified himself as a "Property Clerk," who regularly assisted building managers during arrests for trespass or evictions, is irrelevant, since either position established his reliability and knowledge of the matters at hand. Since the other information provided by the informant, i.e., the presence of persons in the apartment, was still ongoing when the police arrived and was therefore confirmed by their own observations, it is also irrelevant whether the informant had an adequate basis of knowledge of that fact.

The hearing court also rejected defendant's unsupported testimony that she was not in the apartment where the trespassers were located and was instead visiting a friend across the hall. We find no reason to disturb that finding.

We note that defendant has not claimed, either below or on appeal, that her arrest was invalid because it was made without a warrant, and the issue is clearly unpreserved (see, People v Claudio, 64 NY2d 858; People v Smith, 55 NY2d 888, 890; People v Gonzalez, 55 NY2d 887, 888).

Finally, the ruling in this case denying defendant's request to admit into evidence a roster purportedly showing that the apartment was not legally vacant on the date in question and that the information given to the police was therefore incorrect was proper, in light of the fact that the relevant issue at the suppression hearing was whether the information imparted to the police carried sufficient indicia of reliability to permit the officer to reasonably credit it, not whether the information itself was accurate (see, People v Ward, 95 AD2d 233, 237-238; see also, People v Slaughter, 37 NY2d 596, 600; People v Solimine, 18 NY2d 477, 480; People v Bradley, 181 AD2d 316, appeal dismissed 81 NY2d 760). Nor do we find error in any of the other evidentiary rulings contested by defendant. Concur—Ellerin, Nardelli and Mazzarelli, JJ. Murphy, P. J., and Kupferman, J., each dissent in separate memoranda as follows:

Murphy, P. J. (dissenting). A search of the defendant performed by police in the hallway of an apartment building on May 31, 1991 disclosed that she possessed seven vials of cocaine. Defendant having thereafter been arrested and charged with criminal possession of a controlled substance in the fifth degree, moved to suppress the cocaine and certain statements made by her in the immediate aftermath of the

arrest. Upon the denial of her motion, defendant pleaded guilty to the charged offense. At issue on this appeal is the propriety of the motion court's disposition of the suppression motion.

At the suppression hearing, the People's sole witness was Officer Basilio Casado. Casado testified that at about 11:00 A.M. on May 31, 1991, he and several other police officers were approached at the 28th police precinct by Albert Tyson. It was Casado's understanding that Tyson was a building manager in the employ of the New York City Department of Housing Preservation and Development (HPD).[1] According to Casado, Tyson stated that earlier in the day he had been to apartment 3W at 109 West 111th Street where he had encountered persons whose presence he believed to have been unauthorized because the apartment was supposed to be vacant. He thus requested that the police accompany him to the apartment to assist in evacuating the unauthorized occupants. Without additional inquiry, Casado and several other officers immediately complied with Tyson's request. Casado testified that the police officers and Tyson drove to the premises together in police vehicles, arriving there at about 11:30 A.M. Casado stated that it was he who knocked upon the door of apartment 3W and that when the door was opened he observed within some ten to thirteen people including the defendant all of whom stated that they were either visiting or had come with a friend. Casado, however, "advised everybody that was there that they didn't belong in that apartment, *that the apartment was supposed to be vacant* and they were all under arrest for trespassing"[2] (emphasis supplied). Following the group arrest, everyone who had been in the apartment was ordered to line up against the wall in the adjoining common hallway. The arrestees were then searched and it was in the course of this search that the vials of cocaine were discovered in defendant's back pocket.

---

1. Casado was, of course, mistaken in this regard. As Tyson himself testified, he was not a building manager but merely a property clerk and in that capacity only intermittently visited the subject premises. Casado admitted that Tyson had never identified himself as a building manager. The basis for Casado's assumption that Tyson was a manager is not discernible from the record.

2. Indeed, lest there should be some contention that the arrest of those present in apartment 3W was predicated upon anything more than the precinct report characterizing them as trespassers by reason of their presence in a supposedly untenanted apartment, it should be emphasized that Casado testified that those within the apartment were under arrest "as soon as they opened the door".

The defendant testified in her own behalf that she had not been in apartment 3W but had been visiting with a friend, Kenya Harris, who lived in apartment 3C, the apartment immediately next to apartment 3W; she stated that she had gone to the Harris apartment to repay a loan with S.S.I. funds she had just received. As she was leaving the Harris apartment, she observed Officer Casado knock on the door of apartment 3W. A girl answered the door and, according to defendant, advised Casado that her mother was the leaseholder of the premises. Casado, however, ordered everyone out of the apartment and against the wall. It was at this point that defendant, while making her way to the stairwell, was accosted by Officer Casado and ordered to join those found within apartment 3W. She stated that she was then searched and that after the drugs were found in her pocket she was advised that she was under arrest.[3] Defendant testified that she did not see Tyson on the day of the arrest and that she had never been in apartment 3W.

Tyson, a real property clerk for HPD, was called as a witness by the defense. He testified that his office was located at 157 East 125th Street and that he performed no regular duties at 109 West 111th Street. He had, in fact, been to the subject premises only twice during all of 1991. He stated that several days prior to the arrest he had been advised by the HPD building manager, a Mr. Sylvester O'Diese, that there were trespassers in apartments 2C and 3W and that he, Tyson, should have them removed.[4] According to Tyson, it was based on this information alone that he went to the 28th

---

3. It should be noted that defendant's claim that she was not placed under arrest until *after* the drugs were recovered from her (i.e., that she was not in apartment 3W and had not prior to her arrest on the drug charge been arrested for trespass) is lent support by the account of the arrest given by Casado to the prosecutor's office on the afternoon of the arrest. The Assistant District Attorney's write-up of defendant's arrest, as it was described to him by Officer Casado on the afternoon of May 31, 1991, stated "Others received summons *[sic]*. Defendant was arrested *after* P.O. Ramos searched the defendant and found the vials" (emphasis supplied).

4. The basis for O'Diese's reported assertion that there were trespassers in apartment 3W is nowhere disclosed in the record. Although Tyson was under the impression that O'Diese visited the premises every few weeks, he apparently had no knowledge as to whether it was on the occasion of one such visit that O'Diese ascertained that there were trespassers upon the premises. Nor was Tyson able to shed any light upon the basis for O'Diese's crucial assertion that the premises were supposed to be vacant. Indeed, it was clear from Tyson's testimony that if in fact that assertion had ever been made, it was baseless, for Tyson testified that he had subsequently learned that as of May 31, 1991 there had been a legal tenant of record for

precinct on May 31st and requested police assistance in removing the trespassers; he was very clear that he had not in advance of his trip to the 28th precinct checked HPD records to ascertain whether there was a legal tenant of record for either apartment and was similarly clear that, contrary to Casado's testimony as to what he had said at the precinct, he had not been to the building previously that day. Indeed, it was clear that at the time of his visit to the precinct Tyson had no first hand knowledge of any trespassers on the subject premises. Moreover, Tyson acknowledged that although he was not aware of it at the time, the subject premises were not in fact supposed to be vacant; subsequent inspection of HPD records revealed that as of May 31, 1991 apartment 3W had a legal tenant of record. When asked whether he knew who the tenant of the apartment was Tyson testified:

"A. I understand who the tenant is now, yes.

"Q. Did you know then on 5/31 who the tenant was?

"A. I didn't have the name of the tenant, no.

"Q. You had never spoken with your legal department to find out who the tenant was?

"A. No."

It was the prosecution's contention at the suppression hearing that the police had probable cause to arrest all those found within apartment 3W based upon Tyson's precinct report of trespassers in premises which were supposed to be vacant and that defendant, having been found within apartment 3W, was therefore legally arrested and searched; the warrantless search of the defendant's person was, according to the prosecution, sustainable as a search incident to an arrest for which there had been probable cause. And, indeed, it was upon this theory that suppression was denied, the court stating: "Officer Casado, I find, was informed by Tyson that there were trespassers in that apartment, apartment 3W, that on the basis of that representation by Tyson, who is a representative of the city agency that owns these buildings, on the basis of that representation Officer Casado had a basis for going to that building. And if he found anybody in the building, he would have the right to immediately arrest them for criminal trespass. Having arrested the defendant for criminal trespass, the police had a proper right as a lawful incident to that arrest to affect *[sic]* a search of the defendant."

---

apartment 3W. Certainly, this essential information would have been known to O'Diese if he had checked the monthly compiled HPD tenant roster.

It was, of course, the People's burden at the suppression hearing to go forward with evidence showing that there was probable cause for the defendant's arrest *(People v Parris,* 83 NY2d 342, 346; *People v Petralia,* 62 NY2d 47, 52, *cert denied* 469 US 852).* And, although, in doing so, they were not forbidden from relying on hearsay, they were nevertheless obliged to show both that the source of the information upon which the police acted was reliable and that the information itself was reliably based *(Spinelli v United States,* 393 US 410; *Aguilar v United States,* 378 US 108; *People v Parris,* 83 NY2d 342, *supra).*

It may be accepted for purposes of argument that the police were justified in believing Tyson a reliable informant and that, although Tyson himself testified to the contrary, he had in fact told Casado that he had been to the subject premises earlier in the day and had, while there, encountered persons whose presence he believed to have been unauthorized. The difficulty with this as a predicate for a finding of probable cause sufficiently broad to justify the arrest of defendant and anyone else allegedly found within the apartment is that Tyson did not communicate to Casado any basis, reliable or otherwise, for his assertion that *all* the persons in the apartment were trespassers. While it may be that Tyson believed the apartment to be untenanted and accordingly that anyone found there could be considered a trespasser, there is no indication in the record that Casado made any inquiry of Tyson or was otherwise informed by him respecting the ground for this belief. Plainly, even if Tyson had been to the apartment and had encountered there people whom he did not recognize as tenants, that circumstance alone would not have justified the inference that everyone in the apartment was probably trespassing. It would have only been by ascertaining that the apartment was in fact untenanted that Tyson could have concluded that anyone found there was a trespasser. Yet, as noted, Casado made no inquiry and was not otherwise apprised by Tyson whether any search of HPD records had been performed to confirm that the apartment was untenanted.

It has been observed that "when the subject of the suppression hearing is evidence which was the product of a warrantless arrest or seizure, the suppression court's probable cause analysis is essentially 'the same as that used by a magistrate in passing on an application for an arrest or search warrant' *(People v Dodt,* 61 NY2d 408, 415 [citations omitted]; *see also, People v Petralia,* 62 NY2d [47,] 52 [, *cert denied* 469 US 852],

*supra)" (People v Parris, supra,* at 346). The question then which this Court must ask as it assesses the adequacy of the predicate for the arrest of defendant as a trespasser, is whether, if a warrant had been sought—as it doubtless should have been in this completely unemergent situation[5] in which the contemplated entry affected a dwelling *(see, Payton v New York,* 445 US 573, 582)—it would have properly issued upon a showing simply that the police informant, Tyson, believed the subject apartment to be untenanted and accordingly that anyone who might be found there could be considered a trespasser. I should think it absolutely clear that no court reviewing such an application could issue a warrant without inquiring into the basis for the critical hearsay allegation that the apartment was supposed to be vacant; and, where, as here, it was not shown that the allegation was the result of any reliable investigation, that the warrant would be denied. The contrary result sanctioned by the court, effectively places the police at the bidding of any building functionary[6] who wishes to empty an apartment unit. It will no doubt come as a disquieting surprise to apartment dwellers to learn that they may be arrested as trespassers in their own homes upon the merest representation of a building custodian that the apartments occupied by them are supposed to be vacant. And, lest it be thought that this in some way exaggerates the bareness of the predicate upon which the police acted and would presumably claim the right to act in the future, Officer Casado's description of the information he believed justified the intrusion in the present case provides sobering indication to the contrary: "He's [Tyson's] the manager of the apartment. He says nobody is supposed to be there. We go in and we remove the people".

To be clear, the argument for suppression in this case is not that the police committed a *Payton* violation vis-à-vis the defendant, it is rather that in a situation in which a *Payton*

5. It will be recalled that by May 31st, the date Tyson finally got around to initiating the subject police action, the report of O'Diese indicating that there were trespassers in apartments at 109 West 111th Street was already several days old.

6. While the hearing court in assessing the sufficiency of the probable cause predicate apparently attached some importance to the fact that Tyson was an employee of HPD, the reason for this is unclear. There is no reason to suppose that officials of a city agency may trigger an intrusion into a dwelling upon a less demonstrably reliable predicate than would be required from a citizen informant unaffiliated with a government agency. Persons who dwell in city owned housing have no less compelling claim to the full protection of the Fourth Amendment than anyone else.

violation might easily have been committed and perhaps was, the police not only failed to obtain prior judicial authorization for their intrusion, but failed to base their intrusion upon any predicate which might retrospectively be viewed as sufficient to justify the arrest of defendant or any one else in the apartment for criminal trespass. Thus, although the issue in this case is simply whether there was probable cause for the defendant's arrest based upon what transpired between Tyson and Casado at the precinct, it is an issue which arises in a particularly sensitive context—one in which the core Fourth Amendment right of persons to be secure in their homes against unreasonable intrusions by agents of the State is closely implicated. In this context especially the People should be held strictly to their burden of establishing probable cause for the defendant's arrest. Indeed, even where the contemplated intrusion does not affect the privacy of the home the predicate for an arrest or search such as the one at bar where the police have elected to proceed without a warrant, should be subjected to heightened judicial scrutiny, for "Courts generally exercise a higher level of scrutiny when reviewing probable cause determinations made by police acting without a warrant than when reviewing determinations made by a detached and neutral magistrate" *(People v Bigelow,* 66 NY2d 417, 424, n). Accordingly, while I should think it clear that the probable cause predicate advanced by the People is insufficient on any application of the substantive standards enunciated in *Aguilar-Spinelli,* it must be viewed as glaringly so when subjected to the more exacting scrutiny reserved for warrantless intrusions; and, obviously, the circumstance that area affected by the present intrusion, i.e., an apartment, was of a kind which the police should have understood could not be invaded in non-emergent circumstances without a warrant unless it was reliably established that the nominal dwelling space was not being used as such, is highly relevant to the inquiry the court must perform. For where, as here, the police proceed without a warrant in circumstances where they know or should know that a warrant is required the inference is very strong that a warrant was not sought because a neutral Magistrate would not have issued it.

This inference draws support not only from a hearing record which establishes conclusively that there was no reliable basis for Tyson's precinct assertion that everyone in the apartment was trespassing, but from testimonial inconsistencies casting significant doubt upon whether even the proffered predicate, deficient as it was, was extant at the time the police

undertook to clear apartments 2C and 3W of their occupants. While the foregoing probable cause analysis assumes the truth of the testimony offered by the People, the prosecution's version of the relevant events was hardly free from doubt. We are in essence asked to believe that presumably responsible officials of a city agency charged with the administration of city owned apartments would take measures to have persons in those apartments arrested as trespassers without even bothering to consult the monthly compiled HPD tenant roster to ascertain whether the apartments to be evacuated were legally tenanted. We are additionally asked to believe that the police would immediately acquiesce in a request by a building functionary of uncertain rank and authority[7] to have several apartment units cleared of their occupants without first obtaining a warrant or even attempting to ascertain whether there was some reliable basis for the functionary's assertion that the apartments were supposed to be empty. This already highly improbable scenario is in no way rendered more credible by the hearing testimony purporting to describe in greater detail the events leading to and attending the arrest. Tyson, whose reliability as an informant was essential to the finding of probable cause, gave testimony in numerous respects materially divergent from that of Casado. As noted, contrary to Casado's testimony, Tyson denied that he had ever represented to Casado that he had any first hand knowledge of persons trespassing on the premises.[8] In addition, Tyson's

---

7. As noted (supra, n 1), although Casado persistently referred to Tyson as the building manager, that was not Tyson's title. Nor, as Casado admitted, had Tyson ever identified himself to Casado as the building manager. So far as can be told from the record, Casado simply assumed that Tyson performed some managerial function at the premises.

8. The contrast between Casado's testimony and that of Tyson is striking. Casado's account of Tyson's precinct complaint is as follows:

"Casado: He [Tyson] advised us that at a prior occasion he had gone there and advised the residents of that apartment that they were to vacate that apartment by the date that is in question, 5-31-91.

"Q: At what time had Mr. Tyson gone to apartment 3W?

"Casado: He went on that date prior to talking to us at 11 o'clock. He went there approximately 10:30 to 11 o'clock. He went there and saw there was people occupying the apartment."

Tyson, however, when asked whether he had been to 109 West 111th Street before going to the 28th precinct gave the following testimony:

"Tyson: No. I didn't go to 109.

"Q: You have no question about that, you never * * *

"Tyson: I never went to 109 before the precinct, no."

Indeed, Tyson who testified that he had only been to 109 West 111th Street

recollection of when the arrests had occurred and the manner in which they were effected differed markedly from Casado's. Tyson, for example, first testified that he did not arrive at the 28th precinct until 1:30 in the afternoon. He then stated that he might have arrived as early as 12:30 P.M. and, finally, after a purported reference to his field sheets, stated that he had arrived at the precinct at noon and at the apartment building 15 minutes to a half hour later. It will be recalled, however, that Casado had testified that Tyson arrived at the precinct at 11:00 A.M., and police records showed conclusively that defendant was already under arrest by noon. Tyson also stated that after his visit to the precinct he drove to the premises in his own car. Yet Casado had testified that Tyson had accompanied the police to the apartment building in their patrol car. Respecting what transpired once they reached the building, Tyson's testimony was notably inconsistent and unclear. He initially stated that it was he who knocked on the door of apartment 3W.[9] He then stated that although he knocked upon the door, the police had already entered the apartment. He then stated that he knocked upon the door before the police entered. Eventually, Tyson gave up all pretense at recollection and simply admitted that he had no memory of what he had done at the building on May 31, 1991: "I really don't remember what I did when I went to this building. I can't remember. I really don't." Given the numerous disparities between Casado's account and that of Tyson, and, indeed, Tyson's nearly complete inability to recall what had occurred on the occasion of the contested seizure, the issue raised on the present record is not simply whether the version of the People's witness, Casado, is sufficiently credible to support a finding of probable cause, but even more fundamentally whether Casado's ostensible informant, Tyson, actually played any role at all in initiating and executing the police sweeps of apartments 2C and 3W. In prehearing statements made on separate occasions to a Legal Aid investigator and defense counsel Tyson apparently denied having played a part in the subject sweeps[10] and, even while he subsequently testified that

twice during 1991, stated that he had not made any previous visit to the building during May of that year.

9. Casado had, of course, testified that it was he who knocked on the door of apartment 3W.

10. Tyson testified that he had spoken with Gene Keane, an investigator for Legal Aid, early in March 1992 and acknowledged that he had initially disclaimed any involvement in the May 31, 1991 police action at 109 West 111th Street. Tyson claimed, however, that "about an hour or two" after

he had participated in the sweeps, he had, as noted, no recollection of what had occurred.

Although I do not conclude upon the present record that the proffered predicate for the defendant's arrest was fabricated, I do think it clear that very serious questions were raised as to its authenticity. Had these questions been raised respecting a facially sufficient predicate, it would have been necessary for the court to pass upon the credibility of the People's witness and in that context I believe it would have been appropriate on this record to afford the defendant substantially more latitude than was permitted by the hearing court to prove her claim of fabrication. As it was, however, the predicate advanced by the People in justification of the challenged intrusion was not facially sufficient and, accordingly, inquiry into the claim of fabrication was not necessary to the proper disposition of the suppression motion. My discussion of the evidence relevant to and indeed troublingly supportive of the fabrication claim then would not be dispositionally pertinent, except that this Court in determining to affirm the defendant's conviction has, while disregarding the patent deficiency of the predicate upon which the challenged police conduct was purportedly based, gone on to embrace the police account of the relevant events as creditworthy. This is most regrettable, for not only has the Court in overlooking the single relevant legal issue in this case made bad law the effect of which will be seriously to compromise the privacy interest at the very heart of the Fourth Amendment, i.e., the right of persons to be secure in their homes against warrantless intrusions, but it has in so doing also sanctioned a course of police conduct which may well have been more than merely technically violative of the law of search and seizure. As noted, there is a most serious question raised on this record as to whether the police possessed any predicate at all, much less the legally insufficient one advanced, to justify their May 31, 1991 sweep of apartments 2C and 3W at 109 West 111th Street. To have reached and resolved this issue as this Court has done unnecessarily raises the specter that the Court has lent legitimacy to official conduct which was at best simply illegal and which

---

speaking with Keane he "went over [his] books and whatnot" and "found that I had been there, and I had done it." It was his testimony that he thought he had phoned Keane back to advise him that the information he had originally supplied had been inaccurate. It appears, however, that some three days later Tyson spoke with defendant's trial counsel and notwithstanding his claimed mnemonic renewal of three days before again stated that he had not been to 109 West 111th Street on May 31, 1991.

may, given the present record, have been considerably worse. While courts weighing conflicting evidence in criminal proceedings may sometimes be forced to make choices entailing some risk of sanctioning corrupt police conduct,[11] this case properly considered entailed no such risk. Here, careful application of settled standards relevant to the evaluation of probable cause, quite apart from vindicating crucially important Fourth Amendment interests, should have completely insulated both this Court and the hearing court from such exposure. It is at best a hollow refrain that our judgments are too often infected by an unreliable evidentiary base when we do not avail those judgments the full measure of protection against such compromise afforded, and indeed mandated, by law.

Accordingly, the judgment of the Supreme Court, New York County (Frederic S. Berman, J.), rendered May 28, 1992, convicting defendant of criminal possession of a controlled substance in the fifth degree and sentencing her to a prison term of 1½ to 3 years, should be reversed on the law, the motion to suppress granted and the indictment dismissed.

Kupferman, J. (dissenting). An official for the Department of Housing Preservation and Development (HPD) believed an apartment in one of the projects to be vacant, but occupied by trespassers. He was mistaken in his belief because the apartment was under lease. Acting in good faith, and without verifying the lease situation, the official entered the apartment, accompanied by members of the Police Department, who then arrested the people who had been inside, lined them up in the hallway and searched them.

The defendant claimed that she was visiting another apartment and was included simply because she was passing by. If the latter were the case, then there was no probable cause to search her and the evidence should be suppressed. Even if she had indeed been inside the apartment, the evidence should

---

11. The extent to which judicial determinations in criminal proceedings have been rendered vulnerable to contamination by police falsification has been a recent subject of official inquiry by the Mollen Commission. In its Report the Commission observed, "As with other forms of corruption, it is impossible to gauge the full extent of police falsifications. *Our investigation indicated, however, that this is probably the most common form of police corruption facing the criminal justice system, particularly in connection with arrests for possession of narcotics and guns.* Several officers also told us that the practice of police falsification in connection with such arrests is so common in certain precincts that it has spawned its own word: 'testilying' " (Report of Commn to Investigate Allegations of Police Corruption and Anti-Corruption Procedures of Police Dept, at 36; emphasis added).

also be suppressed because there was no emergency and the entry and arrests would be in violation of the rule in *Payton v New York* (445 US 573).

In the recent case of *People v Spencer* (84 NY2d 749; *see,* Stein, *New York Court of Appeals Roundup,* NYLJ, Feb. 9, 1995, at 3, col 2), the Court of Appeals, in a 4 to 3 decision, suppressed the evidence obtained in good faith and with reasonable cause in a stop of a moving vehicle.

While the minority in that case, in my opinion, had the better view, we are still constrained to follow the rule. While Coke did not have the problem of moving vehicles in his day, he did make it clear that a person's home is a castle not to be invaded and there was no warrant in the case at bar. Accordingly, the evidence should be suppressed.