*625
 
 OPINION OF THE COURT
 

 Levine, J.
 

 Defendant was convicted after a jury trial of two counts of peijury in the first degree (Penal Law § 210.15). The conviction was premised on defendant’s denial, during a Grand Jury investigation, that he had been present at an October 20, 1990 meeting at which information pertaining to an upcoming New York City Transit Police Department promotional examination was illegally revealed to defendant and other potential examinees.
 

 Facts and Procedural History
 

 The following evidence was adduced at defendant’s trial. Defendant, his partner and acquitted co-defendant David Tar
 
 *626
 
 quiñi, Lizette Lebrón, Debra Gillians and Joyce Sellers were all New York City Transit Police officers assigned to District One under the command of Lieutenant Michael Gordon. These individuals, including Gordon, were also personal friends who socialized together. In 1990, Gordon was assigned to help draft an examination scheduled to be given near the end of the year to those Transit Police officers seeking promotion to the rank of sergeant. Defendant, Tarquini, Lebrón and Gillians were all preparing to take the promotional examination.
 

 On Friday, October 19 and Saturday, October 20, 1990, Gordon set up by telephone a meeting for late Saturday night to be attended by defendant, Lebron, Tarquini and Gillians at which the contents of the promotional examination would be disclosed. The October 20 telephone conversation between Gordon and Lebron was inadvertently recorded on Lebron’s telephone without the knowledge of either party. At trial, Lebron testified that she was present at the October 20 midnight study session at Gordon’s apartment, along with defendant, Tarquini and Gillians. At that meeting, Gordon distributed various questions that were ultimately included on the promotional examination and Lebron and the others each copied the questions, which they took with them.
 

 On October 23, Lebron’s live-in boyfriend, Transit Police Detective John Lohan, returned from a weekend away, discovered evidence of Lebron’s October 20 visit to Gordon’s home and, in questioning Lebron about it, was told that Gordon had made a sexual overture toward her that night. In an angry confrontation between Gordon and Lohan the next day, the October 20 cheating session was accidentally disclosed to Lohan. Immediately afterward, Gordon called Lebron, asking that she not turn over her notes of that session to Lohan but rather give them to defendant or Joyce Sellers. That call also was taped without the knowledge of either Gordon or Lebron.
 

 The sergeant’s examination was given on February 2, 1991. Defendant and the other District One officers who attended Gordon’s study group, with the exception of Lebron, took the examination. Shortly thereafter, an investigation was launched concerning allegations of cheating on the test. When that investigation became public, Lebron delivered photocopies of the examination materials that she had copied, along with the tapes of her telephone conversations with Gordon, to the Department’s Internal Affairs Bureau. Before turning over the audio recordings, however, Lebron taped over certain conversations which she claimed were personal in nature and irrele
 
 *627
 
 vant to the investigation. She also taped over at least one conversation with Gordon, allegedly by accident.
 

 The February 1991 promotional examination was eventually invalidated, and a substitute examination was given on February 2, 1992. Defendant, Tarquini and Gillians all took the substitute examination and their rankings on the technical knowledge section of the examination dropped significantly below their performance on the 1991 examination. Defendant was called before the Grand Jury investigating the allegations of cheating and, after being granted immunity, testified that he had never been to Gordon’s home in 1990, that he had never been to Gordon’s home when Lebron was present and that he did not attend a study session at Gordon’s home on October 20, 1990. He was subsequently indicted for six counts of perjury based upon those sworn denials.
 
 [1]
 

 At trial, Gordon was called as a People’s witness and invoked his privilege against self-incrimination. Over defendant’s objections, the October 20 recorded conversation between Gordon and Lebron concerning the intended meeting of the exam takers at Gordon’s home later that evening was admitted in evidence under the state of mind exception to the hearsay rule, and the October 24 recorded call in which Gordon asked Lebron to dispose of her notes was introduced as a declaration against penal interest.
 

 On appeal, defendant’s principal arguments for reversal focus on the claimed errors of the trial court in admitting in evidence against him the recordings of the October 20 and October 24 telephone conversations between Gordon and Lebron. He also claims that the trial court committed reversible error in refusing to give an adverse inference charge as a sanction against the People for Lebron’s admitted destruction of audio-taped evidence. The Appellate Division affirmed defendant’s conviction in all respects (247 AD2d 251), as do we.
 

 Admissibility of Gordon’s October 20 Statement to Lebrón under the State of Mind Exception to the Hearsay Rule
 

 On Friday, October 19, 1990, Lieutenant Gordon telephoned both defendant and Lizette Lebrón. On Saturday, October 20,
 
 *628
 
 at about 10 p.m. he again called Lebron and, as previously noted, that conversation was recorded. First, Gordon reminded her of the meeting which had been set up in the previous telephone conversation, to which Lebron replied that he had not told her the time when it was to take place. Gordon then stated “I got Sam and Dave they’re coming to my house around, between 11:00 and 12:00 o’clock tonight * * * [f]or what * * * I told you yesterday.” Lebrón asked for confirmation that the purpose of the meeting that night was “[s]o you’re just going to tell me what to study and I’ll study it?” Gordon replied affirmatively. Lebrón testified that “Sam” referred to defendant and “Dave” was David Tarquini, both of whom were planning to take the sergeant’s promotional exam.
 

 The October 20 recorded conversation between Gordon and Lebron concerning the intended meeting of all of them at Gordon’s home later that evening “to tell [them] what to study” was admitted into evidence against defendant under the state of mind exception to the hearsay rule. It was offered in this perjury prosecution of defendant to prove, contrary to defendant’s Grand Jury testimony, that the planned meeting of defendant, Lebron and other officers to discuss the promotional exam questions, did in fact take place.
 

 The seminal precedent on the admissibility of Gordon’s October 20 statement is the celebrated 1892 decision of the United States Supreme Court in
 
 Mutual Life Ins. Co. v Hillmon
 
 (145 US 285).
 
 [2]
 
 Because the issue is an important one of first impression in our Court, and because we disagree with the defendant’s reading of
 
 Hillmon,
 
 a recital at length of the facts, issues and the holding in the case is necessary.
 

 The plaintiff in
 
 Hillmon
 
 was the wife of John W. Hillmon, suing the insurers on three recently purchased policies covering his life. Her evidence of Hillmon’s death was that in early
 
 *629
 
 March 1879 he left Wichita with a friend named Brown looking for land to purchase for use as a cattle ranch. Two weeks later, while encamped in Crooked Creek, Kansas, Hillmon was killed by the accidental discharge of Brown’s gun. He was buried in a neighboring town. The defendant insurance companies introduced evidence that the body was not that of Hillmon, but of Frederick Walters, who had disappeared at the same time. The body was exhumed and Walters’ relatives identified it as his.
 

 At issue in the
 
 Hillmon
 
 case was the admissibility, of two letters Walters wrote in early March 1879, to his sister and fiancée, in which he related his intention to accompany
 
 “a
 
 certain Mr. Hillmon,” and
 
 “a
 
 man by the name of Hillmon” on a trip from Wichita. In Walters’ letter to his fiancée he told her that Hillmon’s purpose was “to start a sheep ranch, and as he promised me more wages than I could make at anything else I concluded to take it.” The defendant insurers sought to introduce the letters in support of their defense that Hillmon induced Walters to accompany him to some remote place where he would be killed in order to provide a corpse on which to base Mrs. Hillmon’s fraudulent claim to the proceeds of the policies insuring her husband’s life.
 

 The
 
 Hillmon
 
 trial court excluded the letters on the ground that they were hearsay. A jury found in favor of Hillmon’s wife. The United States Supreme Court reversed and ruled that upon retrial, the letters would be admissible under the state of mind exception to the hearsay rule. The Court held that a declarant’s extra-judicial statement of intention can be admitted into evidence under that exception “whenever the intention is of itself a distinct and material fact in a chain of circumstances” (145 US, at 295). In support of the admissibility of Walters’ declarations, Justice Gray, writing for the Court, pointed to factors in the case of the kind that Wigmore and other scholars identify as justifying most common-law hearsay exceptions, i.e.,
 
 “a
 
 circumstantial probability of trustworthiness, and a necessity, for the evidence” because of the unavailability of the declarant (5 Wigmore,
 
 op. cit.,
 
 § 1420, at 251). Justice Gray wrote: “Letters from [Walters] to his family and his betrothed were
 
 the natural, if not the only attainable, evidence of his intention”
 
 (145 US, at 295 [emphasis supplied]). The Court also emphasized that trustworthiness was bolstered because the letters were “written by [Walters]
 
 at the very time
 
 and
 
 under circumstances precluding a suspicion of misrepresentation” (id.,
 
 at 295 [emphasis supplied]).
 

 
 *630
 
 Because Walters was unavailable to testify to accompanying Hillmon on his search for suitable ranch land, and because of the foregoing salient indicia of trustworthiness of Walters’ declarations of his intent to do so, the court ruled that his letters were of sufficient probative value on the insurers’ defense theory to be admissible “as evidence that * * * [Walters] had the intention of going [away from Wichita],
 
 and of going with Hillmon
 
 which
 
 made it more probable
 
 both that he did go and
 
 that he went with Hillmon,
 
 than if there had been no proof of such intention” (id., at 296 [emphasis supplied]).
 

 In its
 
 Hillmon
 
 decision, the Supreme Court quoted extensively from an 1878 New Jersey high court decision in a Camden murder case,
 
 Hunter v State
 
 (40 NJL 495). In the prosecution of Hunter, the New Jersey court upheld the admissibility of the victim’s oral and written declarations to his family the day before that he was going to travel from Philadelphia to Camden with Hunter on business. In
 
 Hillmon,
 
 Justice Gray excerpted portions of the
 
 Hunter
 
 opinion, in which the New Jersey court similarly supported its admissibility ruling on the basis of factors demonstrating the trustworthiness of the declaration (145 US, at 299).
 

 Defendant argues that this case differs from
 
 Hillmon
 
 in several major respects. According to defendant, the October 20 statement is being offered not at all to prove the future intent and subsequent act of Gordon, the declarant, but solely to prove the future intent and subsequent act of defendant, a nondeclarant. Defendant would read
 
 Hillmon
 
 to support admissibility of a statement of future intent to prove only the solitary acts of the declarant. He claims that using Gordon’s statement to prove his acts expands
 
 Hillmon
 
 “far beyond its logical and intended limits.” Additionally, defendant contends that here the declaration implicitly asserts and is being used to prove not just “future intent and subsequent acts, but also acts prior to the declaration — Gordon’s implied assertion that defendant had previously agreed to meet at his home.
 

 In our view these criticisms misconstrue the probative value of Gordon’s October 20 statement in defendant’s perjury trial and misread
 
 Hillmon.
 
 Gordon’s statement of his future intent and his subsequent actions with the prospective examinees taken upon that intent were highly relevant to the perjury prosecution of defendant. Defendant was charged with false testimony before a Grand Jury inquiring into his
 
 joint
 
 action with Gordon and Lebron at their meeting at Gordon’s home regarding the forthcoming promotional examination. Gor
 
 *631
 
 don’s intent to hold that meeting and to reveal the examination questions supplied the materiality element of the questions defendant falsely answered. Without proof of Gordon’s plan and his joint action upon it with the recipients of the illegal disclosures, defendant’s answers to the questions posed before the Grand Jury would be meaningless to a trial jury.
 

 Likewise, the defendant’s narrow interpretation of
 
 Hillmon
 
 as holding that a declarant’s statement of intention can be admitted only for the purpose of proving the declarant’s solitary future action cannot be squared with Justice Gray’s articulation of the Court’s ruling on the state of mind exception and his description of the probative value of Walters’ declaration on the ultimate issue — whether the body Brown had buried near Crooked Creek was Hillmon or Walters.
 

 The Supreme Court in
 
 Hillmon
 
 ruled that Walters’ declarations of intent to leave Wichita were “competent” not only to permit a trier of fact to infer that he went away (the limited application of the
 
 Hillmon
 
 doctrine advocated by defendant) but also to permit the inference, so the Court explicitly stated, “that he went with Hillmon”
 
 (Mutual Life Ins. Co. v Hillmon, supra,
 
 145 US, at 296). Indeed, excision of Walters’ declarations of intention to leave
 
 with Hillmon
 
 would have rendered his letters irrelevant to the insurers’ defense that the body held out as Hillmon was really Walters.
 

 The very samé analytical infirmities identified and objected to by defendant in admitting Gordon’s October 20 statement under the state of mind exception were present in
 
 Hillmon.
 
 Just as here, where Gordon’s October 20 statement implies the existence of a prior discussion and agreement concerning the meeting that night, in
 
 Hillmon,
 
 Walters’ statement of intention to accompany Hillmon implied that a prior discussion had taken place in which they had agreed to embark together on a trip to search for suitable ranch land.
 

 Thus,
 
 Hillmon
 
 does fully support the admissibility under the state of mind hearsay exception of Gordon’s October 20 premeeting statement as proof of the joint or cooperative action of Gordon, defendant and others
 
 (see,
 
 authorities cited at footnote 2,
 
 supra).
 
 Indeed, even early commentators who expressed concern that
 
 Hillmon
 
 would be expanded to support admissibility of declarations of memory of past events (essentially destroying the hearsay rule) did not read
 
 Hillmon
 
 in the narrow manner that defendant advocates here
 
 (see,
 
 Seligman,
 
 op. cit., passim;
 
 Maguire,
 
 op. cit.,
 
 at 711;
 
 see also, Shepard v United States,
 
 290 US 96, 105-106 [Cardozo, J.]).
 

 
 *632
 
 Defendant argues alternatively that we should not adopt the entire
 
 Hillmon
 
 doctrine, but limit its application to make a statement of future intent admissible solely to prove the individual act of the declarant. In doing so, our Court would align itself with only one other appellate court in this country in this century in narrowly restricting the state of mind exception to prove solitary acts of the declarant in criminal cases
 
 (see, Clark v United States,
 
 412 A2d 21 [DC Ct App]).
 
 [3]
 
 Jurisdiction after jurisdiction of State and Federal courts have determined to follow the lead of
 
 Hillmon
 
 and
 
 Hunter
 
 in admitting against criminal defendants (upon establishment of an appropriate foundation) the statements of a declarant’s intention to perform acts entailing the participation jointly or cooperatively of the nondeclarant accused.
 
 [4]
 
 We also adopt that rule.
 

 Wigmore in his introductory treatment of the exceptions of the hearsay rule said:
 

 “The needless obstruction to investigation of truth caused by the hearsay rule is due mainly to the
 
 inflexibility
 
 of its exceptions, to the
 
 rigidly technical construction of those exceptions by the courts
 
 * * * and to the enforcement of the. rule when its contravention would do no harm, but would assist in obtaining a complete understanding of the transaction” (5 Wigmore,
 
 op. cit.,
 
 § 1427, at 257 [emphasis supplied]).
 

 
 *633
 
 Rigid construction of the state of mind exception was rejected in
 
 United States v Annunziato
 
 (293 F2d 373 [2d Cir],
 
 cert denied
 
 368 US 919). There, Judge Friendly, writing for the Court, was faced with a hearsay challenge to the admissibility of a declaration of a future plan (that of a contractor to execute a bribery scheme with a corrupt union official) on the ground that the declaration also looked backward to a past event, the arrangement the contractor previously made with the union official. That objection is one of defendant’s principal grounds for opposing the admissibility of Gordon’s October 20 pre-meeting statement — because of its implication of a prior agreement with defendant. Judge Friendly’s reasoning in dismissing the same objection is instructive.
 

 First, he noted, as we have here, that
 
 Hillmon
 
 itself was a case where the declaration of Walters’ intention to travel with Hillmon implicitly “represented a previous arrangement between them” (293 F2d, at 377). Judge Friendly opined that the “ ‘vigorous leap’ ” in expanding the state of mind exception to the hearsay rule was the initial application of the exception to admit statements of intent solely to prove the declarant’s later acts
 
 (id.,
 
 at 378). Once the act of the declarant could be proved through a declaration of intent to do the act, Judge Friendly saw no reason automatically to exclude a declaration of joint activity with a named criminal defendant merely because it expressly or impliedly refers to a prior arrangement with the defendant. “To say that this portion of his statement [of intention to send a bribe to the union official] is sufficiently trustworthy for the jury to consider without confrontation, but that his reference to the telephone call from Annunziato which produced the decision to send the money is not, would truly be
 
 swallowing the camel and straining at the gnat” (id.,
 
 at 377-378 [emphasis supplied]). The declaration’s inclusion expressly or impliedly of past events involving others, motivating or explaining the declarant’s plan “does not demand exclusion or even excision, at least when, as here, the event is
 
 recent,
 
 is within the
 
 personal knowledge
 
 of the declarant and is so integrally included in the declaration of design as
 
 to make it unlikely in the last degree that the latter would he true and the former false” (id.,
 
 at 378 [emphasis supplied]).
 

 The
 
 Hillmon
 
 doctrine is not a revolutionary concept among hearsay exceptions, the dangers in adopting it are not unique, and they can be addressed by imposing foundational safeguards the same as or similar to those we have fashioned with other
 
 *634
 
 hearsay exceptions.
 
 [5]
 
 This would not be the first hearsay exception in which the future acts of a nondeclarant, expressly or impliedly based on previous understandings, are admitted against the nondeclarant. Admissibility of just such a declaration is sanctioned under the statements of co-conspirators exception to the hearsay rule, one so “firmly enough rooted in our jurisprudence that * * * a court need not independently inquire into * * * reliability’
 
 (Bourjaily v United States,
 
 483 US 171, 183). In
 
 Bourjaily,
 
 the Supreme Court upheld the admission of a co-conspirator’s declaration of future actions of the defendant on trial, that a “friend [later identified as defendant] had agreed * * * to buy a kilogram of cocaine and to distribute it [and also] that the friend
 
 would
 
 be at the hotel parking lot, in his car, and
 
 would
 
 accept the cocaine from Greathouse’s car after Greathouse gave Lonardo the keys” (483 US, at 180 [emphasis supplied];
 
 see also, People v Sanders,
 
 56 NY2d 51,
 
 rearg denied
 
 57 NY2d 674).
 

 Moreover, as with other hearsay exceptions, statements of intent to engage in future conduct with another person largely obviate the dangers of a declarant’s faulty memory or perception, two of the four testimonial infirmities (along with insincerity and ambiguity) which the hearsay rule requires to be tested through cross-examination
 
 (see, Williamson v United States,
 
 512 US 594, 598-599; Prince, Richardson on Evidence §§ 8-102, 8-603 [Farrell 11th ed]; 5 Weinstein,
 
 op. cit.,
 
 § 802.02). This is generally sufficient to justify an exception, when there is independent evidence of reliability
 
 (see,
 
 Tribe,
 
 op. cit.,
 
 87 Harv L Rev, at 966).
 

 It is not difficult to fashion foundational safeguards appropriate to ensure against both the dangers of unreliability common to most hearsay exceptions and those peculiar to this one. Thus, before a statement of intent to engage in joint or cooperative activity is admissible against the named nondeclarant, it must be shown that (1) the declarant is unavailable
 
 (cf., People v Thomas,
 
 68 NY2d 194,
 
 cert denied
 
 480 US 948; 5 Wigmore,
 
 op. cit.,
 
 §§ 1420, 1421); (2) the statement of the declarant’s intent unambiguously contemplates some
 
 future
 
 action by the declarant, either jointly with the nondeclarant defendant
 
 *635
 
 or which requires the defendant’s cooperation for its accomplishment
 
 (see, Shepard v United States, supra,
 
 290 US, at 106;
 
 People v Chambers,
 
 125 AD2d 88, 94,
 
 appeal dismissed
 
 70 NY2d 694; Maguire,
 
 op. cit.,
 
 38 Harv L Rev, at 719); (3) to the extent that the declaration expressly or impliedly refers to a prior understanding or arrangement with the nondeclarant defendant, it must be inferable under the circumstances that the understanding or arrangement occurred in the recent past and that the declarant was a party to it or had competent knowledge of it
 
 (see, United States v Annunziato, supra; cf., People v Thomas, supra);
 
 and (4) there is independent evidence of reliability, i.e., a showing of circumstances which all but rule out a motive to falsify
 
 (People v Blades, supra; People v Thomas, supra),
 
 and evidence that the intended future acts were at least likely to have actually taken place
 
 (United States v Sperling,
 
 726 F2d 69, 74 [2d Cir],
 
 cert denied
 
 467 US 1243,
 
 supra; see also, People v Malizia,
 
 92 AD2d 154, 160).
 

 Gordon’s pre-meeting October 20 statement easily meets the foregoing requirements. Gordon was unavailable as a witness, having invoked his privilege against self-incrimination. His October 20 statement unequivocally involved Gordon’s future conduct in conjunction with that of defendant and the other exam takers. Gordon was not to be just a passive recipient of a visit from defendant at his home
 
 (cf., People v Chambers, supra).
 
 The plan was to hold a meeting at which information regarding the questions on the promotional exam was to be given and received. The place of the meeting was largely irrelevant to the plan.
 

 To the extent that expressly or by implication Gordon’s declaration may have included an assertion that a prior arrangement to hold the meeting occurred, it was inferable from the evidence that the arrangement was a recent one and that Gordon was a party to it. Gordon personally telephoned Lebrón on October 19 to make the initial date for the examination session the following evening. He also telephoned defendant on October 19. These facts, together with the highly sensitive and incriminating nature of the meeting certainly would permit the trial court to infer that when Gordon told Lebrón “I got Sam,” he based this on personal contact.
 

 There was also independent corroborative evidence supporting the trustworthiness of Gordon’s October 20 declaration to Lebrón. Gordon in fact was in a position to reveal information regarding the questions that would be on the examination. Gordon’s motive to ingratiate himself with Lebrón would have
 
 *636
 
 been undercut had he not been telling the truth. Gordon’s statement opened him up to criminal prosecution and the destruction of his career as a superior officer in the Transit Police. “[E]ven reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true”
 
 (Williamson v United States, supra,
 
 512 US, at 599).
 

 Finally, there was independent evidence that the intended meeting likely and indeed actually took place. The evidence established a likelihood that defendant and the other officers under Gordon’s command who were planning to take the promotional exam would comply and cooperate with Gordon’s plan to hold the cheating session on the evening of October 20. Reliability is especially enhanced under the
 
 Hillmon
 
 doctrine when the declarant holds power or control over the persons whose joint or cooperative conduct is necessary to accomplish the declarant’s intentions
 
 (see,
 
 Friedman,
 
 op. cit.,
 
 96 Yale LJ, at 711-715). Lebron actually testified in detail that the meeting took place and that test information was shared. All of these facts and circumstances more than satisfy the corroboration standard we adopted with regard to declarations against penal interest — evidence establishing a reasonable possibility of the statement’s veracity
 
 (see, People v Thomas, supra,
 
 68 NY2d, at 200), and that standard also suffices here. Thus, the trial court properly admitted Gordon’s October 20 statement under the state of mind exception to the hearsay rule.
 

 Admissibility of Gordon’s October 24, 1990 Statement as a Declaration Against Penal Interest
 

 As previously described, a face-to-face confrontation between John Lohan and Gordon occurred on October 24, over the latter’s sexual advances toward Lizette Lebrón. During that confrontation, Gordon inadvertently disclosed the October 20 cheating session attended by Lebrón and other officers at Gordon’s home. Lohan threatened to disclose this to the Internal Affairs Bureau of the Transit Police. Immediately following that meeting, Gordon made the telephone call to Lebrón in which he requested that she turn over to “Joyce or Sam or somebody” the “papers,” which she understood to mean the notes she took at the late night October 20, 1990 meeting. He specifically asked her not to give the papers to Lohan. Lebrón testified that she had copied information Gordon furnished them on the actual questions which would be included in the Transit Police promotional exam. She also testified that “Sam”
 
 *637
 
 referred to defendant, and “Joyce” to Joyce Sellers, another personal friend of Gordon’s and a District One Transit Police officer under his command.
 

 On this appeal, defendant has not contested that Gordon’s October 24 recorded telephone call to Lebrón meets all four of the prerequisites of our case law for admissibility as a declaration against penal interest
 
 (see, People v Thomas,
 
 68 NY2d,
 
 supra,
 
 at 197). First, Gordon was unavailable as a witness, having invoked his constitutional privilege against self-incrimination. Second, it was clearly inferable that Gordon, a career police officer, was aware at the time that his October 24 statement was highly incriminating, involving the suppression or potential destruction of evidence establishing his criminal conduct in giving out answers to the exam. Third, Gordon certainly had competent knowledge of the matter under discussion.
 

 The fourth requirement was also satisfied. There was ample independent, direct and circumstantial evidence to assure the trustworthiness of Gordon’s statement linking him to the cheating scheme and its attempted cover-up. Unquestionably, Gordon knew from the immediately preceding circumstances that what he said was of the highest importance. He was at risk of criminal prosecution and the ruination of his career if Lebron did not comply with his request. Thus, he had every reason to be sincere and honest in speaking to her. Lebrón corroborated defendant’s participation in the October 20 session on the exam questions. Independent corroboration was also supplied by the evidence of the officers’ significantly poorer rankings on the second exam after the results of the first test were invalidated. Cumulatively the foregoing evidence amply satisfied the fourth requirement for admissibility of a declaration against penal interest that “circumstances independent of the hearsay declaration itself are present which
 
 fairly tend to support
 
 the assertions made and thereby assure their trustworthiness”
 
 (People v Thomas, supra,
 
 68 NY2d, at 200 [emphasis supplied]).
 

 Defendant’s contention is that the trial court committed reversible error in admitting Gordon’s October 24 statement without redacting his and Sellers’ names. He argues first that, under our precedents, redaction of the name of a nondeclarant defendant is always required because admissibility is strictly limited to the portion of the statement that inculpates the declarant and no other person. We have not, and should not adopt any per se rule requiring invariable redaction of the name of a co-perpetrator in any declaration against penal inter
 
 *638
 
 est. The United States Supreme Court’s decision in
 
 Williamson v United States
 
 (512 US 594,
 
 supra)
 
 teaches why such an ironclad rule would unduly restrict the declaration against penal interest exception to the hearsay rule. In
 
 Williamson,
 
 the Supreme Court interpreted rule 804 (b) (3) of the Federal Rules of Evidence (the hearsay exception for declarations against penal interest) much as our Court has established by common law, to limit admissibility to those portions of the hearsay statement which are actually self-inculpatory to the declarant
 
 (see, People v Brensic,
 
 70 NY2d 9, 16;
 
 People v Thomas, supra,
 
 68 NY2d, at 198;
 
 People v Maerling,
 
 46 NY2d 289, 298).
 

 Justice O’Connor, writing for the majority in
 
 Williamson,
 
 expressly eschewed application of broad general rules to determine whether a given statement is against the declarant’s penal interest. “[W]hether a statement is self-inculpatory or not can only be determined by viewing it in context” (512 US, at 603), and can “only be answered in light of all the surrounding circumstances”
 
 (id.,
 
 at 604). To illustrate that point, Justice O’Connor demonstrated that, in a particular context, the identification of a co-perpetrator in a statement may indeed be so additionally inculpatory of the speaker as to
 
 itself
 
 constitute a declaration against penal interest:
 

 “Even statements that are on their face neutral may actually be against the declarant’s interest. T hid the gun in Joe’s apartment’ may not be a confession of a crime; but if it is likely to help the police find the murder weapon, then it is certainly self-inculpatory.
 
 ‘Sam and I went to Joe’s house’ might be against the declarant’s interest if
 
 * * *
 
 being linked to Joe and Sam would implicate the declarant in Joe and Sam’s
 
 conspiracy”
 
 (id.,
 
 at 603 [emphasis supplied]).
 

 Justice Scalia, in a concurring opinion in
 
 Williamson,
 
 also recognized that naming an accomplice may well add to the incriminatory nature of a statement and, therefore, qualify it as a declaration against penal interest:
 

 “Moreover, a declarant’s statement is not magically transformed from a statement against penal interest
 
 into one that is inadmissible merely because the declarant names another person or implicates a possible codefendant.
 
 For example, if a lieutenant in an organized crime operation described the inner workings of an extortion and protection racket,
 
 *639
 

 naming
 
 some of the other actors and thereby
 
 inculpating
 
 himself on racketeering and/or conspiracy charges, I have no doubt that some of those remarks could be admitted as statements against penal interest”
 
 (id.,
 
 at 606-607 [emphasis supplied]).
 

 The same position was taken by the Advisory Committee on the then-proposed Federal Rules of Evidence:
 

 “Whether a statement is in fact against interest must be determined from the circumstances of each case. Thus a statement admitting guilt and
 
 implicating another person,
 
 made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest * * * On the other hand,
 
 the same words spoken under different circumstances, e.g., to an acquaintance,
 
 would have no difficulty in qualifying” (Advisory Comm Notes, reprinted following US Code Annot, Fed Rules Evid, rule 804, at 449).
 

 Our own decisions are not to the contrary. Indeed, while expressing similar skepticism regarding the reliability of statements inculpating others given during custodial interrogation, we opted against a per se rule of redaction of the accusatory portion of the declaration in the prosecution of a co-defendant, in favor of a nonconclusive presumption against reliability, with the ultimate determination dependent upon the circumstances of the individual case
 
 (see, People v Brensic, supra,
 
 70 NY2d, at 26;
 
 People v Geoghegan,
 
 51 NY2d 45, 49;
 
 see also, People v Blades,
 
 93 NY2d 166).
 

 Alternatively, defendant argues that, in this case, the specific naming of defendant as the requested recipient of Lebron’s exam notes was not self-inculpatory of Gordon and therefore should have been redacted. We disagree. As the preceding discussion shows, a determination of whether the specific naming of defendant in Gordon’s October 24 telephone conversation with Lebrón constitutes a declaration against penal interest requires an assessment of the incriminatory potential of the instruction to give the papers to defendant and not to Lohan, in the situational context in which it was made. That context was Gordon’s urgent need to have Lebron’s papers turned over to a reliable ally before Lohan got them from her. The papers constituted conclusive documentary proof that he had divulged the contents of the exam questions. Gordon was aware of Lohan’s hostility because of his sexual overtures toward Lebrón
 
 *640
 
 and. feared that she had revealed the scheme for cheating on the examination. In the confrontation between Gordon and Lohan on October 24, Gordon admitted that Lebron’s papers contained answers to the exam and implored Lohan not to turn the papers over to the Internal Affairs Bureau, because it would ruin him. When Lohan rejected his entreaties, Gordon threatened him. Significantly, Gordon told Lohan that disclosure of Lebron’s notes on the exam questions would be futile because he had friends who would
 
 destroy
 
 them and quash the investigation.
 

 It was immediately after that meeting that Gordon telephoned Lebrón to instruct her not only to withhold her notes from Lohan — a personal enemy — but also to turn, them over to defendant, or another trusted subordinate in the District One unit, or “somebody” — presumably someone within the same intimate circle. Surely, it was reasonably inferable by the trial court that Gordon’s motive for requesting that the papers be released to the specific persons named was that they would be willing confederates in an obstruction of justice — the destruction of evidence of his official misconduct in disclosing the answers to the sergeant’s promotional exam — the very same threat he expressed to Lohan at their meeting just before his call to Lebron
 
 (see,
 
 Penal Law § 215.40 [Tampering with physical evidence]).
 

 Thus, it seems indisputable that the call and naming of defendant were indivisible components of the second set of Gordon’s criminality, the attempted cover-up of his earlier crime. The naming of defendant, a friend and participant in the first crime, was, therefore, unequivocally self-inculpatory and hence, admissible as a declaration against penal interest. By no means could Gordon’s naming of defendant as the requested recipient of Lebron’s papers be considered neutral (and therefore not against penal interest), because Gordon did not expect defendant to be a neutral party if he obtained possession of the papers. In those respects, the specific naming of defendant in Gordon’s urgent call on October 24 for Lebrón to deliver the papers to defendant bears a remarkable likeness to Justices O’Connor’s and Scalia’s examples of when a declarant’s inclusion of another person in the statement falls within the declaration against penal interest exception to the hearsay rule and is, therefore, admissible in the prosecution of the person named.
 

 Moreover, the facts and circumstances surrounding the October 24 statement completely rule out any motive on Gor
 
 *641
 
 don’s part to falsify in his declaration
 
 (see, People v Blades, supra,
 
 93 NY2d, at 175-176). Contrasted with the “sliding scale [plea] bargain”
 
 (id.,
 
 at 176) in
 
 Blades,
 
 which gave the co-defendant an incentive to allocate in aid of the prosecution’s case irrespective of the true facts, here, Gordon’s incentive was to be absolutely accurate and sincere in directing Lebrón to transfer the incriminating documents to defendant. For all of these reasons, admission of the October 24 statement in unredacted form was well within the “sound discretion”
 
 (People v Thomas, supra,
 
 68 NY2d, at 199) of the trial court, “ ‘which is aptly suited to weigh the circumstances surrounding the declaration and the evidence used to bolster its reliability’ ”
 
 (id.,
 
 at 198 [quoting
 
 People v Settles,
 
 46 NY2d 154, 169]).
 

 Confrontation Clause Analysis
 

 Defendant’s contention that the admission of the premeeting and post-meeting statements violated his right to confront witnesses guaranteed by the Federal and New York Constitutions is also unavailing
 
 (see,
 
 US Const 6th Amend; NY Const, art I, § 6). The Supreme Court has developed a two-part test “for determining when incriminating statements admissible under an exception to the hearsay rule also meet the requirements of the Confrontation Clause”
 
 (Idaho v Wright,
 
 497 US 805, 814).
 

 First, the Sixth Amendment establishes a “rule of necessity’ which typically requires the prosecution to demonstrate that the declarant is unavailable to testify
 
 (id.).
 
 Gordon’s unavailability, by invoking his Fifth Amendment rights at defendant’s trial, is not contested here. Second, a statement admitted under a hearsay exception avoids conflict with the confrontation clauses only if it bears adequate “indicia of reliability’
 
 (Idaho v Wright, supra,
 
 at 815). The indicia of reliability requirement can “be met in either of two circumstances: where the hearsay statement ‘falls within a firmly rooted hearsay exception,’ or where it is supported by ‘a showing of particularized guarantees of trustworthiness’”
 
 (id.,
 
 at 816 [quoting
 
 Ohio v Roberts,
 
 448 US 56, 66]). Hearsay exceptions recognized as firmly rooted include dying declarations, cross-examined prior-trial testimony, business and public records
 
 (Ohio v Roberts,
 
 at 66, n 8,
 
 supra)
 
 and statements of co-conspirators
 
 (Bourjaily v United States,
 
 483 US, at 182-184,
 
 supra).
 

 A Supreme Court majority has never held that statements against penal interest or statements of future intent are among the firmly rooted hearsay exceptions. The prevailing view
 
 *642
 
 among the Federal Circuit Courts, however, is that the statement against penal interest exception is sufficiently rooted to satisfy the reliability requirement of the Confrontation Clause
 
 (see, United States v Barone,
 
 114 F3d 1284, 1302 [1st Cir],
 
 cert denied 522
 
 US 1021;
 
 Neuman v Rivers,
 
 125 F3d 315, 319 [6th Cir],
 
 cert denied 522
 
 US 1030;
 
 United States v York,
 
 933 F2d 1343, 1363 [7th Cir],
 
 cert denied
 
 502 US 916;
 
 United States v Keltner,
 
 147 F3d 662, 671 [8th Cir],
 
 cert denied sub nom. Nabors v United States,
 
 — US —, 119 S Ct 574;
 
 LaGrand v Stewart,
 
 133 F3d 1253, 1269 [9th Cir],
 
 cert denied
 
 — US —, 119 S Ct 422;
 
 but see, United States v Flores,
 
 985 F2d 770, 776 [5th Cir];
 
 Earnest v Dorsey,
 
 87 F3d 1123, 1131 [10th Cir],
 
 cert denied
 
 519 US 1016).
 

 There is also precedent holding that the state of mind exception to the hearsay rule is a firmly rooted hearsay exception
 
 (see, Lenza v Wyrick,
 
 665 F2d 804, 811 [8th Cir];
 
 Moore v Reynolds,
 
 153 F3d 1086, 1107 [10th Cir],
 
 cert denied
 
 — US —, 119 S Ct 1266;
 
 Forrest v State,
 
 721 A2d 1271, 1277 [Del];
 
 State v Wood,
 
 180 Ariz 53, 64, 881 P2d 1158, 1169,
 
 cert denied
 
 515 US 1147). Indeed, the Eighth Circuit directly addressed the state of mind exception in the context of statements of future intent and held that the exception is firmly rooted for Confrontation Clause purposes
 
 (Lenza v Wyrick, supra).
 

 Here, however, because both of the statements at issue bear sufficient “particularized guarantees of trustworthiness,” we need not rely upon a conclusion that these hearsay exceptions are “firmly rooted” for purposes of Confrontation Clause analysis
 
 (see, Latine v Mann, 25
 
 F3d 1162, 1166 [2d Cir],
 
 cert denied
 
 514 US 1006). When considering whether a statement is sufficiently supported by particularized guarantees of trustworthiness, its reliability “must be shown from the totality of the circumstances, but * * * the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief’
 
 (Idaho v Wright,
 
 497 US, at 819,
 
 supra).
 

 Included in the factors that the Supreme Court previously has considered to determine if a statement is sufficiently trustworthy are spontaneity, repetition, the mental state of the declarant, absence of motive to fabricate
 
 (Idaho v Wright, supra,
 
 497 US, at 821), unlikelihood of faulty recollection and the degree to which the statement was against the declarant’s penal interest
 
 (Dutton v Evans,
 
 400 US 74, 89). Other courts have considered the status or relationship to the declarant of the person to whom the statement was made (i.e., to a law
 
 *643
 
 enforcement officer or to a trusted friend), whether there was a coercive atmosphere, whether it was made in response to questioning and whether the statements reflect an attempt to shift blame or curry favor
 
 (see, United States v Matthews,
 
 20 F3d 538, 546;
 
 United States v Barone, supra,
 
 114 F3d, at 1302;
 
 Earnest v Dorsey, supra,
 
 87 F3d, at 1133-1134;
 
 United States v York, supra,
 
 933 F2d, at 1362-1363).
 

 Under the foregoing factors, the circumstances surrounding Gordon’s statements bear amply sufficient indicia of reliability to satisfy constitutional requirements. Neither statement was made in a custodial setting to a person acting in the capacity of a law enforcement officer. Instead, Gordon was speaking to a trusted friend, someone he was willing to help cheat on an exam and someone whom he thought would help him cover up his misconduct. Both statements were unsolicited and spontaneous.
 

 Reliability is also inferable because each statement was “truly self-inculpatory”
 
 (see, Earnest v Dorsey, supra,
 
 87 F3d, at 1134). As previously discussed, the pre-meeting statement implicated Gordon in misconduct concerning the exam, and thus is the type of admission that we can presume he would not express unless it were true. Similarly, the post-meeting statement was self-inculpatory because it clearly demonstrated Gordon’s motive to conceal or destroy the evidence of his earlier crime. Thus, the statement, in and of itself, incriminated Gordon by establishing his attempt to suppress physical evidence by his accomplices’ acts of concealment or destruction
 
 (see,
 
 Penal Law § 215.40).
 

 Neither statement evinces any attempt to shift the blame to another person and Gordon had no apparent motive, when talking to Lebrón, to fabricate. Indeed, Gordon’s mental state at the time he made these statements further supports their reliability. He made the pre-meeting statement to inform Lebrón, in whom he had a romantic interest, of a meeting to take place at his home that evening, surely because he wanted her to participate. As to the October 24 post-meeting statement, Gordon was in a desperate situation and was clearly motivated by his desire to convince Lebrón to get the papers into trusted hands. All of the events took place within a four-day period, concerning matters which must have been vividly emblazoned in Gordon’s memory. Thus, defendant’s constitutional rights to be confronted by the witnesses against him were not violated here.
 

 
 *644
 
 Permissive Adverse Inference Charge
 

 We find no abuse of discretion in the trial court’s refusal to grant defendant’s request for a permissive adverse inference charge as a sanction against the People for Lebron’s destruction of evidence. The People do have an affirmative obligation to preserve all discoverable evidence within their possession
 
 (People v Martinez,
 
 71 NY2d 937, 940;
 
 People v Kelly,
 
 62 NY2d 516, 520). “Accordingly, where discoverable evidence
 
 gathered by the prosecution or its agent is lost,
 
 the People have a heavy burden of establishing that diligent, good-faith efforts were made to prevent the loss”
 
 (People v Kelly,
 
 62 NY2d,
 
 supra,
 
 at 520 [emphasis supplied]). Otherwise, the trial court will exercise its discretion in choosing an appropriate sanction
 
 (id.,
 
 at 521;
 
 see, People v Martinez,
 
 71 NY2d,
 
 supra,
 
 at 940).
 

 Here, when the evidence was destroyed, it had not been “gathered by the prosecution or its agent” and, thus, the People had no affirmative obligation at that point to preserve it. Typically, sanctions are imposed where a law enforcement officer acting within the scope of his or her official duties loses or destroys evidence already committed to the police’s custody
 
 (see, e.g., People v Joseph,
 
 86 NY2d 565;
 
 People v Wallace,
 
 76 NY2d 953;
 
 People v Haupt,
 
 71 NY2d 929;
 
 People v Martinez,
 
 71 NY2d 937, supra;
 
 People v Kelly,
 
 62 NY2d 516,
 
 supra).
 
 In this case, however, Lebron was not acting as an agent of the People when, acting for personal motives, she destroyed parts of her own tapes before handing them over to the authorities. In addition, Lebron’s credibility was attacked in extensive cross-examination regarding her willful destruction of the tapes. Thus, although the People might be held accountable for a key witness’ actions in some situations, under these facts we perceive no error in the trial court’s refusal to instruct the jury that they were permitted to infer that the destroyed evidence would have been harmful to the People’s case.
 

 Defendant’s remaining contentions are also without merit.
 

 Accordingly, the order of the Appellate Division should be affirmed.
 

 Chief Judge Kaye and Judges Bellacosa, Smith, Ciparick, Wesley and Rosenblatt concur.
 

 Order affirmed.
 

 [1]
 

 . The Grand Jury separately indicted Gordon with two counts of official misconduct in violation of Penal Law § 195.00 and four counts of obstructing civil service rights in violation of Civil Service Law § 106. In March 1994, Gordon was convicted of both counts of official misconduct and three of the four counts of obstructing civil service rights.
 

 [2]
 

 .
 
 Hillmon
 
 is probably the most often and intensely examined case in all of American evidence jurisprudence. It is specifically analyzed at length in the evidence treatises (see,
 
 e.g.,
 
 6 Wigmore, Evidence § 1725 [Chadboum rev 1976]; 2 McCormick, Evidence § 275 [4th ed 1992]; 5 Weinstein, Federal Evidence § 803.07 [2d ed]). In addition, there are numerous articles discussing
 
 Hillmon
 
 in depth (see,
 
 e.g.,
 
 Seligman,
 
 An Exception to the Hearsay Rule,
 
 26 Harv L Rev 146 [1912]; Maguire,
 
 The Hillmon Case
 
 — Thirty-Three
 
 Years After,
 
 38 Harv L Rev 709 [1925]; Hutchins and Slesinger,
 
 Some Observations on the Law of Evidence
 
 — State
 
 of Mind to Prove an Act,
 
 38 Yale LJ 283 [1929]; Tribe,
 
 Triangulating Hearsay,
 
 87 Harv L Rev 957 [1974]; McFarland,
 
 Dead Men Tell Tales: Thirty Times Three Years of the Judicial Process After Hillmon,
 
 30 Vill L Rev 1 [1985]; Friedman,
 
 Route Analysis of Credibility and Hearsay,
 
 96 Yale LJ 667 [1987]).
 

 [3]
 

 . One other jurisdiction, Missouri, arguably may reject any application of the state of mind exception to prove even the future act of the declarant
 
 (see, State v Fitzgerald,
 
 130 Mo 407, 32 SW 1113 [1895];
 
 but see, State v Santillan,
 
 1996 Mo App LEXIS 1904, 1996 WL 678735 [treating issue of whether
 
 Hillmon
 
 doctrine recognized in criminal cases as an open question]).
 

 [4]
 

 . See 6 Wigmore,
 
 op. cit.,
 
 § 1725, n 1, at 130-136. Wigmore cites authority from no less than 18 States that have adopted
 
 Hillmon
 
 in this context. In addition, numerous other jurisdictions have more recently applied the
 
 Hillmon
 
 rule in this manner
 
 (see, State v McDonald,
 
 872 P2d 627 [Alaska Ct App];
 
 State v Adamson,
 
 136 Ariz 250, 665 P2d 972,
 
 cert denied
 
 464 US 865;
 
 State v Santangelo,
 
 205 Conn 578, 534 A2d 1175;
 
 State v MacDonald,
 
 598 A2d 1134 [Del Super Ct];
 
 Thomas v State,
 
 67 Ga 460;
 
 People v Jones,
 
 84 Ill App 3d 896, 406 NE2d 112;
 
 State v Cugliata,
 
 372 A2d 1019 [Me],
 
 cert denied
 
 434 US 856;
 
 People v Atwood,
 
 188 Mich 36, 154 NW 112;
 
 State v Sharbono,
 
 175 Mont 373, 563 P2d 61;
 
 Lisle v State,
 
 113 Nev 679, 941 P2d 459,
 
 cert denied
 
 — US —, 119 S Ct 81;
 
 State v Brewer,
 
 48 Ohio St 3d 50, 549 NE2d 491,
 
 cert denied
 
 498 US 881;
 
 United States v Houlihan,
 
 871 F Supp 1495 [D Mass];
 
 United States v Sperling,
 
 726 F2d 69 [2d Cir],
 
 cert denied
 
 467 US 1243;
 
 Brown v Tard, 552
 
 F Supp 1341 [D NJ];
 
 United States v Calvert,
 
 523 F2d 895 [8th Cir],
 
 cert denied
 
 424 US 911;
 
 United States v Pheaster,
 
 544 F2d 353 [9th Cir],
 
 cert denied sub nom. Inciso v United States,
 
 429 US 1099).
 

 [5]
 

 . We note that the Law Revision Commission, in its most recent proposal for a State evidence code, essentially adopted a version of the full
 
 Hillmon
 
 doctrine making admissible a “declaration of intent to engage in conduct with another person
 
 to establish the conduct of that other person,”
 
 with foundational safeguards to ensure reliability (Proposed NY Code of Evidence § 804 [b] [5] [1991] [emphasis supplied]).