# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

**724**

**KA 10-01033**

PRESENT: SCUDDER, P.J., FAHEY, PERADOTTO, AND DEJOSEPH, JJ.

---

THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,

V                                                    MEMORANDUM AND ORDER

MARSHALL D. MYHAND, ALSO KNOWN AS MARSHALL
MAYHAND, DEFENDANT-APPELLANT.

---

TIMOTHY P. DONAHER, PUBLIC DEFENDER, ROCHESTER (JANET C. SOMES OF COUNSEL),
FOR DEFENDANT-APPELLANT.

SANDRA DOORLEY, DISTRICT ATTORNEY, ROCHESTER (NANCY GILLIGAN OF COUNSEL),
FOR RESPONDENT.

---

Appeal from a judgment of the Monroe County Court (Frank P. Geraci, Jr., J.), rendered March 17, 2010.  The judgment convicted defendant, upon a plea of guilty, of criminal possession of a controlled substance in the first degree.

It is hereby ORDERED that the judgment so appealed from is unanimously affirmed.

Memorandum:  On appeal from a judgment convicting him, upon his plea of guilty, of criminal possession of a controlled substance in the first degree (Penal Law § 220.21 [1]), defendant contends that County Court erred in refusing to suppress evidence obtained as a result of the execution of a search warrant at defendant's residence.  Specifically, defendant contends that the search warrant was not supported by the requisite probable cause.  We reject that contention.

"Probable cause does not require proof sufficient to warrant a conviction beyond a reasonable doubt but merely [requires] information sufficient to support a reasonable belief that an offense has been or is being committed or that evidence of a crime may be found in a certain place" (*People v Bigelow*, 66 NY2d 417, 423).  While New York has not adopted the "totality-of-the-circumstances analysis" adopted by the United States Supreme Court in *Illinois v Gates* (462 US 213, 238, *reh denied* 463 US 1237; *see People v Griminger*, 71 NY2d 635, 639), the Court of Appeals has held that "[t]he legal conclusion [concerning the existence of probable cause] is to be made after considering all of the facts and circumstances together.  Viewed singly, these may not be persuasive, yet when viewed together the puzzle may fit and probable cause found" (*Bigelow*, 66 NY2d at 423).  In our view, this is one of those situations where the pieces of the puzzle fit in such a manner as to support a finding of probable cause.

In support of the application for a search warrant, the authoring officer noted that defendant had two prior convictions of possession of illegal substances, one of which was a 2002 conviction of criminal possession of a controlled substance in the third degree, i.e., possession with intent to sell (Penal Law § 220.16 [1]).  The officer then summarized his prior experience with a particular confidential informant (CI-1), establishing that he had used CI-1 in previous investigations that led to successful prosecutions.  Police officers used CI-1 to make a controlled purchase of cocaine from defendant at his former residence.  Before and after the purchase, the officers searched CI-1 and his vehicle to ensure that CI-1 was not in possession of any cocaine, and they provided CI-1 with buy money.  Immediately after observing CI-1 enter and exit defendant's former residence, the officers searched CI-1 again, recovering a substance that tested positive for cocaine.  CI-1 informed the officers that defendant had sold CI-1 the cocaine.  The circumstances of that sale are not challenged by defendant.

Following defendant's relocation to a different residence, officers placed that residence under surveillance.  The officer who authored the search warrant application described the circumstances of a second purchase of cocaine.  The officer and another officer met with CI-1, and they searched CI-1 as well as CI-1's vehicle to ensure that CI-1 was not in possession of cocaine.  CI-1 was provided with buy money, and a plan was developed for CI-1 to pick up an "unwitting participant" (UP) who would make the actual purchase.  Officers kept CI-1 under observation while CI-1 met with UP, a black male, who entered CI-1's vehicle.  Officers continued to keep that vehicle under surveillance as it traveled to an area near defendant's new residence.  UP exited the vehicle, walking in the direction of defendant's residence.  He returned approximately 15 minutes later, and he entered and then subsequently exited CI-1's vehicle, which was under surveillance by the officers.  The officers then met with CI-1, who was found to be in possession of a substance that tested positive for cocaine.  CI-1 informed the officers that, in CI-1's presence, UP had telephoned "Dog," i.e., defendant.  When the call ended, UP told CI-1 that "Dog" was ready and directed CI-1 to the area near defendant's new residence.

A similar plan was developed for a third purchase of cocaine.  The officer who authored the search warrant application and another officer met with CI-1, and they searched CI-1 and CI-1's vehicle to ensure that CI-1 was not in possession of any cocaine.  They also again provided CI-1 with a predetermined amount of buy money.  CI-1 was observed meeting the same UP used in sale number two.  After that meeting, officers observed UP travel in his vehicle to an area near defendant's residence.  Officers further observed UP exit his vehicle, enter defendant's residence, and exit that residence with defendant 11 minutes later.  While still under observation, UP entered his vehicle and traveled to rendevous with CI-1.  After UP left the area, the officers met with CI-1, who informed the officers that, when CI-1 met UP, he told CI-1 that "Dog" was ready.  CI-1 told the officers that he gave the buy money to UP, who then drove off in his own vehicle.  CI-1 also told the officers that, when UP returned, he handed CI-1 a knotted sandwich bag that he told CI-1 he had received from "Dog."  The substance in the bag tested positive for cocaine.

Based on the aforementioned facts, the authoring officer applied

for a search warrant to search defendant's new residence.  The application did not seek permission to search any particular person.  The issue before us thus is whether the aforementioned information provided the requisite probable cause for the issuance of the search warrant, i.e., was it "sufficient to support a reasonable belief . . . that evidence of a crime may be found" inside defendant's new residence (*Bigelow*, 66 NY2d at 423).  We conclude that it was sufficient.

As a preliminary matter, we conclude that the search warrant application was sufficient without resorting to any hearsay from either CI-1 or UP.  With respect to the first sale, officers confirmed that CI-1 was not in possession of any drugs, at which point they provided CI-1 with buy money.  The officers then observed CI-1 enter defendant's residence and then exit that residence shortly thereafter.  At that time CI-1 was in possession of cocaine but no longer in possession of the buy money.  That evidence stands independent of any hearsay information from CI-1.  Hearsay information would be required only if the issue before us concerned the identity of the person in that residence who sold the cocaine to CI-1.

The officers then confirmed that defendant relocated to a new residence.  With respect to the second sale, the officers determined that CI-1 was not in possession of any cocaine before CI-1 met with UP, who was then observed by officers going to the area of defendant's new residence.  Officers observed UP return to CI-1, after which the officers confirmed that CI-1 was in possession of cocaine.  Again, none of that information requires resort to hearsay from either CI-1 or UP.  It is based solely on the personal observations of the officers.

Finally, with respect to the third sale, the officers determined that CI-1 was not in possession of cocaine before CI-1 met with UP for a second time.  The officers then observed UP drive his own vehicle to defendant's new residence.  They further observed UP enter and remain inside defendant's residence for 11 minutes, after which they observed him exiting the residence with defendant.  While under continual observation, UP met CI-1 and then drove away.  Immediately thereafter, CI-1 was in possession of cocaine.

As defendant correctly contends, we cannot ignore the remote possibility that UP had cocaine on his person or in his vehicle before ever going near or inside defendant's new residence.  That possibility, however, is not fatal to our analysis.  Although "[h]uman imagination might conjure up possible innocent behavior [by the defendant,] . . . that cannot be the test of probable cause . . . Probable cause does not require proof to a mathematical certainty, or proof beyond a reasonable doubt.  Based on the articulated, objective facts before [the issuing Judge], and the reasonable inferences to be drawn therefrom, it was 'more probable than not' that criminal activity was taking place inside" defendant's new residence (*People v Mercado*, 68 NY2d 874, 877, *cert denied* 479 US 1095).  In our view, it is more probable than not that the cocaine given to CI-1 was obtained from defendant's residence because, otherwise, UP would have simply sold the cocaine to CI-1 himself.

Even assuming, arguendo, that the search warrant application was

not sufficient without resorting to any hearsay evidence provided by CI-1 and UP, we conclude that the hearsay information contained in the search warrant application passed the *Aguilar-Spinelli* test and could thus be used to establish probable cause for the search warrant.  It is well established that "[p]robable cause may be supplied, in whole or part, through hearsay information . . . New York's present law applies the *Aguilar-Spinelli* rule for evaluating secondhand information and holds that if probable cause is based on hearsay statements, the police must establish that the informant had some basis for the knowledge he [or she] transmitted to them and that he [or she] was reliable" (*Bigelow*, 66 NY2d at 423; *see Griminger*, 71 NY2d at 639).  "Notably, where the information is based upon double hearsay, the foregoing requirements must be met with respect to each individual providing information" (*People v Mabeus*, 63 AD3d 1447, 1450, citing *People v Ketcham*, 93 NY2d 416, 421 and *People v Parris*, 83 NY2d 342, 347-348).

" 'If the affidavit rests on hearsay--an informant's report--what is necessary under *Aguilar* is one of two things:  the informant must declare either (1) that he has himself seen or perceived the fact or facts asserted; or (2) *that his information is hearsay, but there is good reason for believing it*' " (*Parris*, 83 NY2d at 347, quoting *Spinelli v United States*, 393 US 410, 425).

We conclude that the application established the reliability and basis of knowledge of CI-1.  Reliability was established by the fact that CI-1 "ha[d] come forward with accurate information in the past" (*People v Rodriguez*, 52 NY2d 483, 489).  Furthermore, the application also established CI-1's basis of knowledge.  With respect to the basis of knowledge prong, "there is no requirement that the information furnished by [the informant] had to be the product of his [or her] personal observations of criminal activity . . . 'What is required is information of such quality, considering its source and the circumstances in which it came into possession of the informant, that a reasonable observer would be warranted in determining that the basis of the informant's knowledge was such that it led logically to the conclusion that a crime had been . . . committed' " (*People v Greene*, 153 AD2d 439, 443-444, *lv denied* 76 NY2d 735, *cert denied* 498 US 947).  "[T]he basis of knowledge test is . . . intended to weed out, as not of sufficient quality, data received by the informant from others who have not themselves observed facts suggestive of criminal activity" (*People v Elwell*, 50 NY2d 231, 237).  Inasmuch as CI-1 received data from someone who had himself observed criminal activity, the goal of the basis of knowledge test has been met (*see Greene*, 153 AD2d at 443-444; *cf. People v Rosenholm*, 222 AD2d 909, 910, *lv denied* 88 NY2d 884).  Although CI-1 did not personally observe any alleged illegality inside or near defendant's new residence, the information provided by CI-1 to the officers was " 'of such quality. . . that a reasonable observer would be warranted in determining that the basis of [CI-1's] knowledge was such that it led logically to the conclusion that a crime had been . . . committed' " (*Greene*, 153 AD2d at 444).  Notably, UP's identity was known to CI-1 (*see id.; see also Rosenholm*, 222 AD2d at 910).

We further conclude that the application established the reliability

and basis of knowledge of UP.  Addressing first UP's basis of knowledge, we note that it is largely undisputed that UP had the requisite basis of knowledge due to his "personal knowledge of the criminal enterprise" (*Mabeus*, 63 AD3d at 1450), and his "personal observations of defendant's possession and sale . . . of cocaine" (*People v Peterson*, 269 AD2d 788, 789, *lv denied* 94 NY2d 951).  Moreover, unlike the situation in *People v Mercado* (45 AD2d 699, 700), the officers' observations of UP both before and after the second and third sales "had [a] bearing on whether [UP] had actually been in [defendant's residence] and made the observation[s] he alleged or that he obtained the [cocaine] from this defendant."

We reject defendant's contention that nothing in the search warrant established UP's reliability.  While an informant's reliability is often established by the fact that the informant had provided reliable information in the past, "there are, of course, other circumstances demonstrating his [or her] probable reliability.  For instance, [the Court of Appeals] . . . [has] noted that a magistrate may rely upon the fact that the information was given under oath, *that the statements were against the informant's penal interest* and that two or more informants tended to confirm the information which each gave" (*People v Wheatman*, 29 NY2d 337, 345 [emphasis added]).  In addressing the use of statements against penal interest as a basis to establish an informant's reliability, the Court of Appeals wrote that, "[w]hile admissions against penal interest may be sufficient to support a finding of probable cause . . . , '[s]uch admissions are not guarantees of truthfulness and they should be accepted only after careful consideration of all the relevant circumstances of the case indicates that there exists a basis for finding reliability' " (*People v Chisholm*, 21 NY3d 990, 992-993).

After careful consideration of all the relevant circumstances of the case, we conclude that " '*there [was] good reason for believing*' " the information supplied by UP to CI-1 (*Parris*, 83 NY2d at 347; *cf. People v Burks*, 134 AD2d 604, 605-606).  First, UP's statement that he obtained the drugs from defendant was a "significant declaration[] against penal interest" (*People v Stroman*, 293 AD2d 350, 350, *lv denied* 98 NY2d 702), i.e., the statements admitting to the purchase and possession of cocaine would have subjected him to criminal liability (*see Greene*, 153 AD2d at 444; *see generally People v James*, 93 NY2d 620, 643).  Moreover, UP knew, at the time of his statement, that the statement was against his penal interest (*see People v Harvey*, 270 AD2d 959, 960, *lv denied* 95 NY2d 835, *lv dismissed* 95 NY2d 853; *see generally People v Brensic*, 70 NY2d 9, 15, *remittitur amended* 70 NY2d 722; Jerome Prince, Richardson on Evidence § 8-411 [Farrell 11th ed 1995]), and his statement was a specific statement about a just-completed purchase (*compare People v Comforto*, 62 NY2d 725, 727, *with Burks*, 134 AD2d at 605).  In *Burks*, a case relied upon by defendant, the informant's statement was only that "he had, on some unspecified past occasions, purchased cocaine from the defendant" (134 AD2d at 605).  The Second Department in *Burks* deemed that statement "not sufficiently contrary to the informant's penal interest to establish reliability" (*id.*).

We likewise reject defendant's contention that UP's statements to CI-1 cannot satisfy the *Aguilar-Spinelli* test because UP's statements were

made only to CI-1 and thus were not made with the knowledge that they were against his penal interest, i.e., UP "thought he was speaking in confidence to a confederate and had no idea there was any risk that the statement would be used against him" (*People v Schmotzer*, 87 AD2d 792, 794). The First Department dispensed with such a contention, writing that, to reject statements against penal interest on that ground, which is "the most probable situation in which a declaration against penal interest would be truthful," would "almost make the possibility of inculpatory use of declarations against penal interest a merely academic exercise without any real situation in which it could be applied" (*id.*). Indeed, in a strikingly similar case, the First Department held that a statement to a friend, "trusted by the declarant not to reveal it to the police," can qualify as a declaration against penal interest (*People v Thomas*, 264 AD2d 691, 692, *lv denied* 94 NY2d 867; *see also James*, 93 NY2d at 643; *People v Ivy*, 217 AD2d 948, 949, *lv denied* 86 NY2d 843).

As further support for our conclusion that " '*there [was] good reason for believing*' " the information supplied by UP to CI-1 (*Parris*, 83 NY2d at 347), we note that the declaration against penal interest was "amply corroborated by 'information obtained from a source other than [UP's] statement' " (*Stroman*, 293 AD2d at 350; *see Ivy*, 217 AD2d at 949). Importantly, the actions of UP and some of his dealings with defendant were personally observed by police officers (*cf. Burks*, 134 AD2d at 605-606). In *Burks*, the Court recognized that "[t]he corroborated details need not be criminal in nature . . . ; however, they must establish 'good reason to believe' that the informant was telling the truth" (*id.* at 606, quoting *Rodriguez*, 52 NY2d at 489). Here, the officers actually observed UP interacting with defendant at defendant's new residence, which corroborated significant details of his statements to CI-1 (*cf. id.* at 605). Significantly, following both the second and third sales and CI-1's meetings with UP, the officers, who had confirmed that CI-1 had not been in possession of cocaine before meeting with UP, obtained cocaine from CI-1.

We thus conclude that "[t]he court properly found that the drug runner who provided the police confidential informant with information was both reliable and had a basis of knowledge for such information. The drug runner's basis of knowledge was established by personal observation of criminal activity[,] . . . [and the] drug runner's reliability was established by the fact that the statements the runner made to the confidential informant were against the runner's penal interest in that the runner implicated himself in the crime" (*Thomas*, 264 AD2d at 692).

We again emphasize that the issue here is not whether there was probable cause to believe that defendant himself was selling cocaine. He was never charged with selling cocaine. Rather, the issue is whether the information contained in the search warrant application was "sufficient to support a reasonable belief that an offense has been or is being committed or that evidence of a crime may be found in a certain place" (*Bigelow*, 66 NY2d at 423). Based on the information provided by CI-1 and UP, as well as the officers' personal observations, the search warrant application established probable cause to believe that cocaine would be found inside defendant's new residence.

Defendant further contends that the court erred in refusing to conduct a *Darden* hearing with respect to UP.  Inasmuch as defendant does not challenge the existence of UP and indeed was able to identify UP, there was no basis for a *Darden* hearing (*see People v Brown*, 2 AD3d 1423, 1424, *lv denied* 1 NY3d 625).

We thus conclude that the court properly refused to suppress the evidence obtained as a result of the execution of the search warrant.

Entered:  August 8, 2014                          Frances E. Cafarell
                                                  Clerk of the Court